396 F.2d 161
 CONTINENTAL BAKING COMPANY, a Delaware corporation, Appellant,
v.
UTAH PIE COMPANY, a Utah corporation, Appellee.
CARNATION COMPANY, a Delaware corporation, Appellant,
v.
UTAH PIE COMPANY, a Utah corporation, Appellee.
PET MILK COMPANY, a Delaware corporation, Appellant,
v.
UTAH PIE COMPANY, a Utah corporation, Appellee.
 Nos. 7306, 7308, 7309.
 United States Court of Appeals Tenth Circuit.
 May 7, 1968, Certiorari Denied Oct. 14, 1968, See 89 S.Ct.
136.
 
 John H. Schafer, Washington, D.C. (Roy M. Anderson, Gordon A. Thomas, Rye, N.Y., Welborn & Dufford, Denver, Colo., and Robert J. Muth, Jonathan D. Blake, Covington & Burling, Washington, D.C., of counsel, of the brief), for appellant Continental Baking Co.
 Peter W. Billings, Salt Lake City, Utah (G. Kenneth Handley, Jr., Salt Lake City, Utah, and James R. Baird, Jr., Los Angeles, Cal. of counsel, on the brief), for appellant Carnation Co.
 George P. Lamb, Washington, D.C. (Lee, Toomey & Kent, Carrington Shields, Washington, D.C., and Gene Mayfield, St. Louis, Mo., of counsel, on the briefs), for appellant Pet Milk Co.
 Matthew P. Mitchell, San Francisco, Cal. (Joseph L. Alioto, San Francisco, Cal., and Robert W. Hughes, Salt Lake City, Utah, on the brief), for appellee Utah Pie Co.
 Before MURRAH, PHILLIPS and LEWIS, Circuit Judges.
 ORIE L. PHILLIPS, Circuit Judge.
 
 
 1
 Utah Pie Company[1] brought this action against Continental Baking Company,[2] Carnation Company,[3] and Pet Milk Company[4] under Title 15 U.S.C.A. 15 and 26.[5]
 
 
 2
 The complaint charged that the appellants entered into a combination and conspiracy to restrain interstate commerce and monopolize such commerce in violation of 1 and 2 of the Sherman Act (15 U.S.C.A. 1 and 2), to be effected by destroying the competition of Utah Pie through the weakening of its capital structure and the destruction of its profits, and to violate 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C.A. 13(a)), by price discrimination in the State of Utah, effected by selling their frozen pies at prices 'below cost' in the State of Utah and at lower prices in such state than they charged for their frozen pies 'in other western states.'[6]
 
 
 3
 The case came on for trial in February 1963. At the close of the evidence, each appellant duly moved for a directed verdict in its favor on the 2(a) claims asserted by Utah Pie. Each motion was denied.
 
 
 4
 The jury returned a verdict in favor of the appellants on the conspiracy claim and a verdict against each appellant on Utah Pie's 2(a) claims. Each appellant, in accordance with Rule 50(b) of the Federal Rules of Civil Procedure, duly made a timely motion to set aside the verdict against it and enter judgment n.o.v. in its favor on Utah Pie's 2(a) claims. Each motion was denied.
 
 
 5
 On February 23, 1963, a consolidated judgment was entered in favor of Utah Pie and against each of the several appellants for treble the amount of the verdict returned against it and for attorneys' fees and costs, and on the same day a decree was entered against each appellant permanently enjoining it from violating 2(a).
 
 
 6
 Each of the appellants separately appealed from such judgment and decree. Thereafter, the injunctive decree was stayed by this court by an order entered March 21, 1963.
 
 
 7
 Each appellant, in its statement of points, urged several grounds for reversal. This is a second hearing of such appeals by this court. At the first hearing, we considered only one of the grounds unged by each of the appellants, that is, that the evidence against it was insufficient to warrant the jury in finding that it had engaged in price discrimination between purchasers of commodities of like grade and quality or in other acts, the effect of which had been, or the probable effect of which would be substantially to lessen competition or to tend to create a monopoly in any line of commerce. We concluded the evidence was insufficient to support such a finding and reversed the judgment and directed that the case be remanded, with instructions to enter a judgment in favor of each of the appellants against Utah Pie on its 2(a) claims.
 
 
 8
 By a petition for a writ of certiorari, Utah Pie sought review in the Supreme Court. The Supreme Court granted the writ and held that the evidence as to each appellant was sufficient to sustain a finding of probable injury to competition by price discrimination by it, within the meaning of 2(a), and reversed the judgment and remanded the case to this court for consideration of the other grounds urged by the appellants for reversal, expressly stating it did not intimate 'any views' on such other grounds. See Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406.
 
 
 9
 Each of the appellants has filed a separate supplemental brief and a reply brief and Utah Pie has filed a consolidated supplemental answer brief. Such other grounds for reversal have been orally reargued and the case again submitted to this court.
 
 
 10
 The jury also returned a verdict in favor of Continental on a counterclaim asserted by it, charging a 2(a) violation by Utah Pie. On Utah Pie's n.o.v. by Utah Pie. On Utah Pie's n.o.v. motion, the court set aside that verdict and entered judgment on the counterclaim in favor of Utah Pie, notwithstanding it had not moved for a directed verdict in its favor on the counterclaim.
 
 
 11
 We held that the trial court erred in entering judgment n.o.v. in favor of Utah Pie, because it had not moved for a directed verdict in its favor on the counterclaim, but for reasons stated in our former opinion, we remanded the case for a new trial on the issues raised by the counterclaim. Continental and Utah Pie acquiesced in our decision with respect to the counterclaim. Hence, only a limited consideration of the counterclaim will be necessary.
 
 
 12
 In our approach to the remaining issues presented by these appeals respecting Utah Pie's 2(a) claims, we start with two established premises:
 
 
 13
 1. That the evidence against each appellant was sufficient to support a finding by the jury of price discrimination by it, the probable effect of which would be injury to competition within the meaning of 2(a);
 
 
 14
 2. Since the jury found in favor of the appellants on Utah Pie's conspiracy claim and Utah Pie has not and does not challenge that finding, the case in its present posture presents a separate and distinct 2(a) violation claim against each appellant, which must be separately considered.
 
 
 15
 While claimed injury to competition and compensable damages to Utah Pie present separate issues, in that the former may be only probable and in the future, and the latter must have already occurred, we must keep in mind that the Supreme Court distinguished the instant case from the cases relied on by this court in its former opinion, for the reasons stated by the Supreme Court, that they involved no 'long-term market price decline,' no 'general decline in price structure,' and no 'lasting impact upon prices.'
 
 
 16
 In passing on the issue of probable injury to competition in our former opinion, we made what we regarded and still believe was an exhaustive and correct statement of the pertinent facts, in five parts. (See Continental Baking Company v. Utah Pie Company, 10 Cir., 349 F.2d 122.) Those five parts are:
 
 
 17
 1. A general statement of facts pertinent in all the appeals (349 F.2d 126-130, inclusive);
 
 
 18
 2. A statement of facts in the main pertinent only in the Pet Milk appeal (349 F.2d 130-137, inclusive);
 
 
 19
 3. A statement of facts in the main pertinent only in the Continental appeal (349 F.2d 137-142, inclusive);
 
 
 20
 4. A statement of facts in the main pertinent only in the Carnation appeal (349 F.2d 142-147, inclusive);
 
 
 21
 5. Tables and charts in the text of the opinion and in the appendices thereto, the latter appearing at 349 F.2d 157-165, inclusive.
 
 
 22
 Reference is here made to the facts set forth in our former opinion and the appendices thereto, since in this opinion certain of the facts stated in our former opinion either will not be restated or will not be restated in as great detail as they were in such former opinion.
 
 
 23
 Of course, we will undertake to supplement facts set forth in our former opinion by additional facts in the record pertinent to a proper consideration of the additional issues now before us for determination; and we will repeat facts stated in our former opinion where we deem it desirable so to do, or necessary to a clear and accurate reflection of the context in which such repeated facts appear in this opinion.
 
 
 24
 * General Statement of Facts
 
 
 25
 The evidence in these cases covers the period 1958 to 1961, both inclusive.[7] It is free from substantial dispute, except for a few statements of opinions or conclusions not based on any substantial underlying proof.
 
 
 26
 The facts stated with respect to the offering prices, selling prices, sales volume, percentage of market shares, earnings, and other like matters, the tables and charts which appear in this and our former opinion, and the appendices annexed to this and our former opinion are all based on uncontroverted documentary evidence, some of which was introduced by Utah Pie and some by the appellants.
 
 
 27
 The phrase 'frozen fruit pies' is sometimes used in the frozen pie industry in a broad sense and as including frozen apple, cherry, boysenberry, peach, pumpkin, and mince pies, although the last two are not, strictly speaking, fruit pies. In its broad sense, that phrase does not embrace frozen cream pies, such as lemon cream, chocolate cream, cocoanut cream, and the like.
 
 
 28
 The frozen pies involved in these appeals are those embraced in the phrase 'frozen fruit pies' in its broad sense.[8] We will hereafter refer to them simply as 'frozen pies.' The phrase 'frozen fruit pies' is also used in a more narrow sense, as embracing only the strictly fruit pies, and not including mince or pumpkin pies. Frozen fruit pies in that narrow sense will be referred to herein as 'frozen fruit pies.'
 
 
 29
 Utah Pie, a Utah corporation, owned and operated by the Rigby family, was in the fresh pie business for nearly 30 years prior to 1957. It marketed its fresh pies in Salt Lake City and other points in Utah, in Las Vegas, Nevada, Grand Junction, Colorado, Farmington, New Mexico, Evanston, Wyoming, and at one other city in Nevada, the name of which does not appear in the record.
 
 
 30
 Faced with a declining volume and a substantial loss in its fiscal year ended October 31, 1957, Utah Pie, in August of that year, entered the frozen pie business. It had much of the facilities needed for the frozen pie business in its old plant. It opened a new plant in 1958, which had a capacity, at least by 1961, on a three-shift basis of 40,000 frozen pies per day, or about one and one-half million cases of frozen pies per year. There are six pies in a case. It had adequate refrigeration for fruit, production facilities, and storage of frozen pies. Its frozen pie business was well managed and its sales and transportation costs were low. It had the only frozen pie plant located in the Salt Lake City market area, which enabled it to deliver to its customers frozen pies in both small and large quantities.
 
 
 31
 The six western states of California, Washington, Oregon, Utah, Arizona, and Colorado embrace a portion of the Inter-Rocky Mountain and West Coast regions. In each of such states there are one or more separate and distinct frozen pie market areas, which comprise a large metropolitan center and the territory closely adjacent thereto. There are distinct frozen pie market areas in and adjacent to Los Angeles, San Francisco, Seattle, Portland, Spokane, Salt Lake City, Phoenix, and Denver. The periphery of each of such market areas is nearly the same as that of the area in which its metropolitan newspapers circulate; that, because retail advertising is the lifeblood of the frozen pie industry and crucial to volume sales. The current retail price in a particular market area at a particular time is generally fixed by the prices at which the chain stores and cooperative grocery organizations advertise their frozen pies in the Thursday and Friday editions of the local newspapers, published and circulated in that market area.
 
 
 32
 The Salt Lake City market area involved in these appeals comprises most of the State of Utah, southern Idaho, and small areas adjacent to Utah in the States of Wyoming, Colorado, and Nevada. That market area developed its own competitive pattern. No brand seemed to enjoy a consumer's loyalty, with the possible exception of Utah Pie's 'Utah' brand. Pies were purchased primarily on a price basis. The prevailing retail price was fixed by the advertised weekend specials appearing in the local newspaper advertisements of the retailers on Thursday and Friday. During the period 1958 to 1961, inclusive, retailers of frozen pies in the Salt Lake City market area advertised Utah Pie's brands a great many more times than they did brands of each of the other manufacturers selling in that market area.
 
 
 33
 At the beginning of the period here involved, the frozen pie business was comparatively new. But by that time it had become highly competitive and it remained so throughout such period.
 
 
 34
 The price in a particular market area depends upon the number and identity of the competing manufacturers, the competitive factors in such market area, and the extent of the thrust or pressure of such factors at a particular time.
 
 
 35
 A local manufacturer and seller, with his plant located in a particular market area, because of his low distribution and selling costs, preferences normally given to a local business, and his ability to sell and distribute frozen pies in either large or small quantities is in a position to assert a very substantial competitive thrust and pressure, not present where there is no local manufacturer and seller competing in the area.
 
 
 36
 Another competitive factor, which affects prices and exists in some market areas, is the sale of private or controlled brands of frozen pies, which are usually sold by the large retail chains and members of cooperative grocery organizations, and are purchased by them in large quantities at preferential prices. A controlled label is owned by the manufacturer, but is sold by it only to one buyer in a particular market. A private brand is owned by the buyer and may be manufactured by one or more suppliers.
 
 
 37
 In the First part of 1958, Utah Pie marketed its frozen pies in Utah and Idaho. It gradually extended its sales to other areas, so that by 1961 it was selling frozen pies in Utah, Idaho, Washington, Colorado, and Wyoming. However, its sales outside of Utah and southern Idaho during the period involved in these appeals, 1958 to 1961, were negligible. See Appendix I, annexed to our former opinion (349 F.2d 157-158).
 
 
 38
 It affirmatively appears from uncontroverted evidence that it was Utah Pie's intention, at the time it entered the frozen pie business in the Salt Lake City market area in August 1957, which was more than a year before there was any claimed or established price discrimination by any of the appellants in such market area, to obtain and retain a dominant position in the frozen pie business in such market area by there offering and selling its frozen pies at prices substantially below those at which its competitors there offered or sold their pies.
 
 
 39
 The earliest month, during which comparative prices at which frozen pies were sold by Utah Pie and each of the appellants are shown in the record, was January 1958.
 
 
 40
 In the following price comparisons, we will use frozen apple pie prices, because frozen apple pie is the most popular and the volume leader of the frozen pies, sells at the lowest prices, and is the most accurate price indicator.
 
 
 41
 In January 1958, which was 23 months before there was any price discrimanation by Pet in the Salt Lake City market area, it sold in such market area its frozen apple pie, 'Pet-Ritz,' its then only brand, at prices ranging from a low of $4.84 per dozen to a high of $5 per dozen, and Utah Pie sold in such market area its frozen apple pie, 'Utah,' its then only brand, at $4.15 per dozen, viz., 69 cents to 85 cents per dozen less than Pet's price.
 
 
 42
 In January 1958, in the Salt Lake City market area, Carnation sold its frozen apple pie, 'Simple Simon,' for $4.82 per dozen and Utah Pie sold its 'Utah' brand frozen apple pie for $4.16 per dozen. In October, November, and December, 1958, Carnation's price for its frozen apple pie was $3.90 per dozen in Salt Lake City, San Francisco, Spokane, and Denver, and Utah Pie's price for its 'Utah' brand frozen apple pie was $4 per dozen in Salt Lake City. But it was not until February 1960 that there was any difference in Carnation's prices for its frozen apple pies in those four cities. In that month, its price in San Francisco was $3.60 per dozen and its price in Salt Lake City, Spokane, and Denver was $3.30 per dozen.
 
 
 43
 And in January 1958, which was more than two years before there was any claimed 2(a) violation by Continental in the Salt Lake City market area, Continental sold in such market area its frozen apple pie, 'Morton,' its only brand, at $4.94 per dozen and Utah Pie sold in such market area its frozen apple pie, 'Utah,' its then only brand, at $4.16 per dozen.
 
 
 44
 The following table, based on invoices of actual sales, copies of which appear in Pet's Exhibit A-35, a 'Market Share and Price Trend Study on 8' Frozen Fruit Pies in the 'Intermountain Market" by Drs. Anderson and Lamborn of Utah State University, sets out the comparative median prices at which frozen pies were sold in the Salt Lake City market area by Utah Pie and each of the appellants in the months of January to December 1958, inclusive, and shows that during such period Utah Pie consistently kept its prices for its frozen pies substantially below the prices for frozen pies of each of the appellants. The prices in such table are for cases of six. The price per dozen was approximately double the price per case.
 
 
 45
 1958 Apple Cherry Peach Boysenberry Mince Pumpkin
----------- -------------------------------------------------
January
-----------
Utah Pie 2.08 2.08 ---- 2.08 ---- ----
Pet Milk 2.47 2.62 2.44 2.84 ---- ----
Carnation 2.42 2.51 ---- 2.76 2.87 ----
Continental 2.47 ---- ---- 2.77 2.77 2.62
February
-----------
Utah Pie 2.15 2.15 ---- 2.15 ---- ----
Pet Milk 2.50 2.50 2.52 2.64 2.85 2.58
Carnation 2.54 2.53 2.60 ---- ---- 2.58
Continental 2.58 2.58 2.58 2.73 ---- 3.05
March
-----------
Utah Pie 2.15 2.15 ---- 2.15 ---- ----
Pet Milk 2.50 2.50 2.53 2.65 ---- ----
Carnation 2.50 2.50 ---- 2.64 ---- ----
Continental 2.58 ---- ---- ---- ---- ----
April
-----------
Utah Pie 2.05 2.08 ---- 2.07 ---- ----
Pet Milk 2.50 2.50 2.50 2.66 ---- ----
Carnation 2.50 2.50 ---- 2.65 ---- ----
Continental 2.58 2.58 ---- ---- ---- ----
May
-----------
Utah Pie 2.04 2.04 ---- 2.04 ---- ----
Pet Milk 2.51 2.53 2.54 2.69 ---- ----
Carnation 2.50 2.50 2.50 2.65 ---- ----
Continental 2.58 2.58 2.58 2.73 ---- 3.05
June
-----------
Utah Pie 2.04 2.04 ---- 2.04 ---- ----
Pet Milk 2.54 2.54 2.54 2.69 ---- ----
Carnation 2.50 2.54 2.60 2.65 ---- ----
Continental ---- ---- ---- ---- ---- ----
July
-----------
Utah Pie 2.04 2.04 ---- 2.04 ---- ----
Pet Milk 2.55 2.55 2.55 2.70 ---- ----
Carnation 2.50 2.56 2.58 2.73 ---- ----
Continental 2.58 2.58 ---- ---- ---- ----
August
-----------
Utah Pie 2.04 2.04 ---- 2.04 ---- ----
Pet Milk 2.52 2.49 2.54 2.68 ---- ----
Carnation 2.55 2.54 ---- 2.70 ---- ----
Continental ---- ---- ---- ---- ---- ----
September
-----------
Utah Pie 2.04 2.04 ---- 2.04 2.00 2.00
Pet Milk 2.51 2.49 2.52 2.68 2.79 2.34
Carnation 2.51 2.52 ---- 2.65 ---- ----
Continental ---- ---- ---- ---- ---- ----
October
-----------
Utah Pie 2.03 2.03 ---- 2.03 1.96 2.00
Pet Milk 2.52 2.52 2.55 2.70 2.67 2.43
Carnation 2.50 2.50 ---- 2.65 2.61 2.36
Continental ---- ---- ---- ---- 2.58 2.34
November
-----------
Utah Pie 2.03 2.04 ---- 2.04 2.14 1.96
Pet Milk 2.52 2.52 2.52 2.67 2.64 2.35
Carnation 2.50 2.50 ---- 2.65 2.66 2.41
Continental 2.58 2.58 ---- ---- ---- ----
December
-----------
Utah Pie 2.00 2.00 ---- 2.00 2.00 1.92
Pet Milk 2.50 2.50 2.50 2.65 2.66 2.38
Carnation 2.54 2.50 ---- 2.65 ---- 2.44
Continental ---- ---- ---- ---- ---- ----
 
 
 46
 Gaylen S. Rigby testified that the dates and amounts of the major changes made by Utah Pie in the price of its 'Utah' brand pie were as follows:
 
 
 47
 Prices of Utah Brand Pie
 --------------------------
 Date Old New
------- ------------ ------------
4/14/58 $ 4.15 $ 4.00
8/10/59 4.00 3.70
6/23/61 3.70 2.75
12/1/61 2.75 2.90
 
 
 48
 But the record shows that Utah Pie's price per dozen for its 'Utah' brand frozen apple pie in
 
 
 49
 December 1959 was $ 3.60
August 1960 was 3.50
September 1960 was 3.16
January 1961 was 3.43
February 1961 was 3.50
March 1961 was 3.10
April 1961 was 3.50
 
 
 50
 Utah Pie's prices for its frozen pies were f.o.b. the purchaser's warehouse, if it was located in Salt Lake City, and if located outside of Salt Lake City, f.o.b. Utah Pie's plant.
 
 
 51
 The manufacturers and distributors of national brands, who sell throughout the United States, the manufacturers and distributors of regional brands, who sell in several local market areas, and sometimes a local manufacturer and distributor, whose single plant is located in a particular market area where his principal business is done, but who also may sell in other market areas in the same region, usually make up the group competing in a local market area. More than 30 different brands are sold in the six western states referred to above, and the number of nation-wide manufacturers of frozen pies is over 200.
 
 
 52
 The brands, or labels, used by the parties to these appeals were as follows:
 
 
 53
 Utah Pie "Utah," "Frost 'N' Flame,"
 
 
 54
 "Mayfresh," and "Sonny Boy"
 
 
 55
 Carnation "Simple Simon";
 
 
 56
 Continental "Morton's";
 
 
 57
 Pet "Pet-Ritz" and "Swiss Miss."Utah Pie and Pet also manufactured frozen pies for Safeway Stores, Inc.,[9] under the latter's label, 'Bel-air.'
 
 
 58
 'Utah' was the label under which Utah Pie sold its frozen pies generally to retailers. 'Frost 'N' Flame,' 'Mayfresh,' and 'Sonny Boy' were controlled labels. 'Bel-air' was a private label belonging to Safeway Stores, Inc.
 
 
 59
 Utah Pie's first customers for its frozen pies were Associated Grocers, Safeway, and Utah Wholesale Grocery. Associated Grocers was the largest and Safeway the second largest buyer of frozen pies in the Salt Lake City market area.
 
 
 60
 From the latter part of 1957, when Utah Pie first entered the frozen pie business in the Salt Lake City market area, continuously to and including the year 1961, Utah Pie's competitive emphasis was on price. Throughout that period, with the exception of a comparatively few instances hereinafter noted, it offered and sold its frozen pies to retail buyers in that market area at prices substantially lower than prices at which its competitors offered and sold their pies in such market area. As we read the Supreme Court decision in Utah Pie Co. v. Continental Baking Co., supra, Utah Pie had a legal right so to do, even though it captured the extraordinary market volume share of 66.5 per cent in 1958, which approached a monopolistic position, and thereafter was the dominant seller in such market area, with a market volume share of 34.3 per cent in 1959, 45.5 per cent in 1960, and 45.3 per cent in 1961, so long as in so doing it did not violate 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C.A. 13(a)).
 
 
 61
 In 1958, Utah Pie sold 75,939 cases of frozen pies; in 1959, 76,744 cases; in 1960, 167,788 cases; in 1961, 205,380 cases; and in 1962, 259,317 cases. During the period 1958 to 1961, inclusive, its volume increased 270.5 per cent and its dollar volume in sales of frozen pies increased from $139,306.24 in the fiscal year ended October 31, 1958, to $407,841.25 in the fiscal year ended October 31, 1961, an increase of 292.8 per cent. During the same four-year period salaries paid the Rigby family engaged in the business increased by approximately $30,000 and net income before taxes, as adjusted, went from a loss of $1,264.51 in fiscal 1958 to a profit in fiscal 1961, before taxes, of $30,597.10. After taxes, it was $19,643.04, which was 28.5 per cent of its net worth.
 
 
 62
 The following table is a composite picture of the total sales volume and the percentage of market shares of each of the parties hereto and the other competitors in the Salt Lake City market area in the years 1958 to 1961, inclusive.
 
 
 63
 1958 (Volume in dozens)
-----
Company Volume % of Market
------- ------ -----------
Carnation 5,863 10.3
Continental 754 1.3
Utah Pie 37,969.5 66.5
Pet 9,336.5 16.4
Others 3,137 5.5
 ------------ ------------
Totals 57,060.0 100.0
1959
----
Company Volume % of Market
------- ------ -----------
Carnation 9,625 8.6
Continental 3,182 2.9
Utah Pie 38,372 34.3
Pet 39,639 35.5
Others 20,911 18.7
 ------------ ------------
Totals 111,729 100.0
1960
----
Company Volume % of Market
------- ------ -----------
Carnation 22,371.5 12.1
Continental 3,350 1.8
Utah Pie 83,894 45.5
Pet 51,480 27.9
Others 23,473.5 12.7
 ------------ ------------
Totals 184,569.0 100.0
1961
----
Company Volume % of Market
------- ------ -----------
Carnation 20,067 8.8
Continental 18,799.5 8.3
Utah Pie 102,690 45.3
Pet 66,786 29.4
Others 18,565.5 8.2
 ------------ ------------
 10
Totals 226,908.0 100.0
 
 
 64
 Associated Grocers, which served 150 to 175 retail stores out of its Salt Lake City headquarters, during the period here involved, was the largest buyer of frozen pies in the Salt Lake City market area during that period. Beginning late in 1959 and continuously thereafter, during the period here involved, Utah Pie sold Associated Grocers frozen pies under its controlled label, 'Frost 'N' Flame.' That pie, identical with the pie marketed by Utah Pie under its 'Utah' brand, was exclusive with Associated Grocers and was sold to it at a price 50 to 60 cents per dozen less than Utah Pie charged nonfavored competing purchasers for its 'Utah' brand.[11] Associated Grocers' tremendous competitive advantage, thus attained, caused it to support 'Frost 'N' Flame' almost exclusively in its advertising. It also guaranteed Utah Pie's dominant position in the market area by foreclosing effective competition by other frozen pie makers through sales to its largest buyer. 'Frost 'N' Flame' quickly replaced 'Utah' brand as the leading brand in the Salt Lake City market area.
 
 
 65
 Utah Pie also produced pumpkin and mince pies for Safeway, the second largest buyer, under Safeway's private label, 'Bel-air,' at prices substantially below those it charged for its identical pie sold under the 'Utah' label to nonfavored competing stores. Utah Pie also continually offered Safeway a preferentially low price on its frozen fruit pies packed under its 'Bel-air' label. Safeway rejected those offers, not because of price, but for other reasons fully set out hereinafter. In 1960, its first year of sales of 'Bel-air' mince and pumpkin pies to Safeway, Utah Pie charged what it later said itself was a 'rock bottom' price, with the hope that it would induce Safeway to drop its then supplier of frozen fruit pies, Pet Milk, in favor of Utah Pie.
 
 
 66
 In 1961, Utah Pie began selling its controlled label 'Mayfresh' pies to Grand Central-American Stores, another of the four largest buyers in the Salt Lake City market area.
 
 
 67
 Early in 1962, Grand Central acquired American Food Stores, another chain, and thereafter Utah Pie sold its controlled label 'Mayfresh' pies to American.
 
 
 68
 It is abundantly clear from the evidence that a substantial part of Utah Pie's constantly growing volume of frozen pies sold in the Salt Lake City market area from 1958 to 1961, inclusive, was due to its sales in such market area of its controlled label pies to Associated Grocers, Grand Central Stores, and American Food Stores, and its sales in such market area of private label 'Bel-air' pies to Safeway, at prices substantially less than it charged for its identical 'Utah' brand, sold to customers generally. In 1959, Utah Pie sold Associated Grocers 18,621 cases of frozen pies; in 1960, Utah Pie sold Associated Grocers 77,894 cases of controlled label 'Frost 'N' Flame' frozen pies; and in 1961, Utah Pie sold Associated Grocers 102,834 cases of controlled label 'Frost 'N' Flame' frozen pies; whereas the whole number of frozen pies sold in such market area in 1961 was only approximately double what it was in 1959.
 
 
 69
 The volume of sales of frozen pies greatly increased throughout the period 1958 to 1961, inclusive, not only in the Salt Lake City market area, but in other market areas. Such sales growth was due in substantial part to advertisements by manufacturers of national brands prior to the beginning of such period, which acquainted housewives with the merits and advantages of frozen pies.
 
 
 70
 As sales volume increased, production costs decreased, and reduction in price normally and naturally followed, apart from any other causes for price decreases.
 
 
 71
 Over the objections of each of the appellants, Utah Pie introduced its Exhibit 95, which reads as follows:
 
 
 72
 UTAH PIE COMPANY
 ----------------
 SUMMARY OF ESTIMATED GROSS PROFITS, REVENUE AND
 -----------------------------------------------
 GOODWILL LOST BY UTAH PIE COMPANY
 ---------------------------------
 BASED ON ESTIMATED SALES LOST TO
 --------------------------------
 DEFENDANTS AND FROM THE EFFECT
 ------------------------------
 OF DEPRESSED PRICES
 -------------------
(A) Estimated gross profit on additional frozen
 fruit pies Utah Pie Company would have sold
 if 1958 market position in relation to
 defendants had been maintained
 Based on selling price of: $4.30 per dozen
 $4.10 per dozen
 $3.90 per dozen
 $3.70 per dozen
(B) Estimated gross profit on 23,000 dozen frozen
 fruit pies if this amount had been sold by
 Utah Pie Company in the Seattle, Spokane
 and Portland Areas
 Based on selling price of: $4.30 per dozen
 $4.10 per dozen
 $3.90 per dozen
 $3.70 per dozen
(C) Estimated gross profit on 231,500 dozen frozen
 fruit pies if this amount had been sold by
 Utah Pie Company in the Denver, Colorado
 Area
 Based on selling price of: $4.30 per dozen
 $4.10 per dozen
 $3.90 per dozen
 $3.70 per dozen
(D) Estimated gross profit on 58,038 and 90,000
 dozen frozen fruit pies if these respective
 amounts had been sold by Utah Pie Company to
 Salt Lake City and Denver Divisions of
 Safeway Stores
 Salt Lake Division
 Denver Division
(E) Additional Revenue Utah Pie Company would have
 received on Private Label sales if prices
 had been equivalent to Safeway contract
 prices
(F) Additional Revenue Utah Pie Company would have
 received on Utah Pie Brand sales if prices
 had been as follows:
 $4.30 per dozen
 $4.10 per dozen
 $3.90 per dozen
 $3.70 per dozen
(G) Loss due to Goodwill and "Going Business
 Concern" value
 GRAND TOTALS
 (A), (B), (C) and (F) based on $4.30 per dozen
 (B), (B), (C) and (F) based on $4.10 per dozen
 (A), (B), (C) and (F) based on $3.90 per dozen
 (A), (B), (C) and (F) based on $3.70 per dozen
 TABLE CONTINUED
 Continental Pet Total
 ----------- --- -----
Carnation Baking Milk Three
--------- ------ ---- -----
 Company Company Company Defendants
 ------- ------- ------- ----------
 $ 32,565 $ 25,134 $ 57,555 $115,254
 28,136 21,755 49,769 99,660
 23,706 18,373 41,983 84,062
 19,277 14,994 34,197 \68,468
 $ 10,872 $ 10,872 $ 5,436 $ 27,180
 9,032 9,032 4,516 22,580
 7,192 7,192 3,596 17,980
 5,352 5,352 2,676 13,380
 $296,920 $296,920
 250,620 250,620
 204,320 204,320
 158,020 158,020
 $ 50,395 $ 50,395
 69,147 69,147
 $ 7,916 $ 6,049 $ 13,910 $ 27,875
 $ 22,539 $ 17,222 $ 39,603 $ 79,364
 15,474 11,823 27,188 54,485
 8,498 6,493 14,930 29,921
 4,108 3,139 7,218 14,465
 $ 25,000 $ 25,000 $ 25,000 $ 75,000
 $ 98,892 $381,197 $261,046 $741,135
 $ 85,558 $324,279 $239,925 $649,762
 $ 72,312 $267,427 $218,961 $558,700
 $ 61,653 $212,554 $202,543 $476,750
 
 
 73
 Over objections of each of the appellants, Utah Pie also introduced its Exhibits 62, 94, and 96 to 101, inclusive, upon which Exhibit 95 is based. Exhibits 62, 94, and 96 to 101, inclusive, are set forth in full in Appendix A, annexed hereto.
 
 
 74
 The damages which Utah Pie attempted to prove it suffered, because of price discriminations by the appellants, are summarized in Utah Pie's Exhibit 95. It is based on other exhibits set out in Appendix A, which we will hereafter discuss.
 
 
 75
 Part (A) of Exhibit 95, which was prepared by a certified public accountant for Utah Pie, sets out estimated gross profits Utah Pie claims it would have realized from sales in the Salt Lake City area in 1959, 1960, and the first eight months of 1961 of its 'Utah' brand frozen pie (sales of its controlled brands, 'Frost 'N' Flame' and 'Mayfresh' frozen pies and private brand 'Bel-air' frozen pies being excluded), but for the price discriminations in such market area by the appellants.
 
 
 76
 It sets forth separately the amount of such damages, if the selling price by Utah Pie was $4.30 per dozen, $4.10 per dozen, $3.90 per dozen, and $3.70 per dozen.
 
 
 77
 The accountant also prepared Utah Pie's Exhibit 96. He sets forth on page 1 thereof, in dozens, the number of frozen pies sold in the Salt Lake City market area, as shown by Utah Pie's Exhibit 62, by Utah Pie and each of the appellants in 1958, 1959, 1960, and 1961, excluding therefrom, however, all of the controlled brands, 'Frost 'N' Flame' and Mayfresh,' of frozen pies sold by Utah Pie, and all of Safeway's private brand 'Bel-air' frozen pies sold by Utah Pie and the appellants in such market area during such period.
 
 
 78
 Basing his computation on the number of frozen pies sold in the Salt Lake City market area by Utah Pie and each of the appellants, set forth on page 1 of Exhibit 96 and derived from Exhibit 62, exclusive of controlled brand and 'Bel-air' private brand frozen pies, in each of the years 1958, 1959, 1960, and 1961, the accountant computed and set forth the percentage of market share, respectively, of Utah Pie, Carnation, Continental, and Pet in such market area in each of such years, as follows:
 
 
 79
 1958 - % 1959 - % 1960 - % 1961 - %
 of total of total of total of total
 -------- -------- -------- --------
Carnation 10.87% 14.74% 24.51% 14.67%
Continental 1.40% 4.87% 3.67% 13.75%
Pet 17.32% 21.70% 31.54% 37.94%
Utah Pie 70.41% 58.69% 40.28% 33.64%
 -------- -------- -------- --------
 100.00% 100.00% 100.00% 100.00%
 
 
 80
 Using 1958 as the base year, the accountant also compiled and set forth in the lower part of page 1 of Exhibit 96, excluding controlled and private brand frozen pies, the increase or decrease in percentage of market share in the Salt Lake City market area of Utah Pie and each of the appellants in the years 1959, 1960, and 1961, as follows:
 
 
 81
 Year Carnation Continental Pet Utah Pie
 ---- --------- ----------- --- ---- ---
1958 (Base Year) 10.87% 1.40% 17.32% 70.41%
1959 Increase (Decrease) 3.87% 3.47% 4.38% (11.72%)
1960 Increase (Decrease) 13.64% 2.27% 14.22% (30.13%)
1961 Increase (Decrease) 3.80% 12.35% 20.62% (36.77%)
 
 
 82
 Since the computations of the accountant, the results of which are set forth on page 1 of Exhibit 96, were based solely on the sales in the Salt Lake City market area, exclusive of controlled and private brands, made by Utah Pie and the appellants, and do not include the sales of any other sellers in that market area, any decreases in the relative proportions of the 'Utah' brand frozen pies sold in such market area in the years 1959, 1960, and 1961 by Utah Pie would necessarily result in relatively proportionate increases in the frozen pies sold by the appellants in the years 1959, 1960, and 1961 in such market area. But that does not establish that such decreases in the proportion of 'Utah' brand frozen pies sold in such market area in 1959, 1960, and 1961 were caused by the price discriminations of the appellants. We shall hereinafter undertake to show there was another reason for such decreases in 1960 and 1961.
 
 
 83
 It should be noted that in the year 1958, used by the accountant as the base year, Utah Pie sold only 'Utah' brand frozen pies, and no controlled or private brand frozen pies were sold by it or the appellants.
 
 
 84
 In 1958, Utah Pie sold 37,969.5 dozen 'Utah' brand frozen pies in the Salt Lake City market area and on the basis employed by the accountant had a market share percentage of the total frozen pies, exclusive of controlled brand and private brand frozen pies sold by it and the appellants in such market area, of 70.41 per cent.
 
 
 85
 In 1959, Utah Pie sold in such market area 38,338 dozen 'Utah' brand frozen pies and only 38 dozen 'Frost 'N' Flame' controlled brand frozen pies.[12]
 
 
 86
 Utah Pie, Carnation, and Continental sold no Safeway private brand 'Bel-air' pies in 1959. Pet sold Safeway 25,462.5 dozen 'Bel-air' brand frozen pies in 1959.
 
 
 87
 However, in 1960 a marked change took place. In that year, Utah Pie sold only 36,759.5 dozen 'Utah' brand frozen pies in the Salt Lake City market area, and its market share percentage of 'Utah' brand pies, on the basis employed by the accountant, decreased 30.13 per cent. But in that year, Utah Pie sold in such market area to Associated Grocers 37,189.5 dozen of its controlled brand 'Frost 'N' Flame' frozen pies, and in that year Associated Grocers, which in 1958 and 1959 was a large volume purchaser of 'Utah' brand pies, purchased only an insignificant number of 'Utah' brand pies.
 
 
 88
 In 1960, Utah Pie also sold in such market area 9,945 dozen 'Bel-air' private brand pies to Safeway. It will be observed that in 1960, in such market area, Utah Pie's sales of its controlled brand 'Frost 'N' Flame' frozen pies exceeded its sales of its 'Utah' brand frozen pies, and its sales of its controlled and private brand frozen pies exceeded its sales of its 'Utah' brand pies by 10,375 dozen.
 
 
 89
 An even greater change took place in 1961. In that year, a year of a very substantial increase in volume of the frozen pies sold in the Salt Lake City market area, Utah Pie sold 46,016 dozen of its 'Utah' brand pies and its market share percentage, on the basis employed by the accountant, decreased 36.77 per cent. In 1961, Associated Grocers purchased only an insignificant number of 'Utah' brand pies. But in that year in such market area, Utah Pie sold 48,963.5 dozen of its controlled brand 'Frost 'N' Flame' frozen pies to Associated Grocers and 1,177.5 dozen of its controlled brand 'Mayfair' frozen pies to Grand Central-American Stores and 6,533 dozen private brand 'Bel-air' frozen pies to Safeway, and the aggregate of Utah Pie's sales of controlled and private brands exceeded its sales of 'Utah' brand frozen pies by 10,658 dozen.
 
 
 90
 Not only did Associated Grocers restrict its purchases from Utah Pie of frozen pies in 1960 and 1961 almost entirely to the 'Frost 'N' Flame' controlled brand, its advertising of frozen pies in those years was almost entirely limited to 'Frost 'N' Flame' frozen pies.
 
 
 91
 Also, it will be noted from the table appearing at page 171 of this opinion that Utah Pie's market share percentage of the total sales in the Salt Lake City market area of frozen pies, which was 66.5 per cent in 1958, fell to 34.3 per cent in 1959, then rose to 45.5 per cent in 1960 and 45.3 per cent in 1961, whereas the market share percentage of sellers of frozen pies in such market area, other than Utah Pie and the appellants, which was 5.5 per cent in 1958, was 18.7 per cent in 1959, 12.7 per cent in 1960, and 8.2 per cent in 1961.
 
 
 92
 Notwithstanding tha facts we have above recited, with respect to the changes that took place in 1960 and 1961, Gaylen S. Rigby testified it was his opinion that, but for the price discriminations of the appellants, the sales of 37,189.5 dozen in 1960 and 48,963.5 dozen in 1961 of 'Frost 'N' Flame' brand frozen pies to Associated Grocers and the reduction of Associated Grocers' purchases of 'Utah' brand frozen pies to an insignificant number in each of those years would not have affected or decreased the sales of 'Utah' brand pies in such market area in those years, and that Utah Pie would have continued to maintain a market share percentage of 70.41 per cent of the frozen pies sold by it and the appellants, exclusive of controlled and private brand frozen pies, through the sale of more 'Utah' brand pies to other buyers in such market area.
 
 
 93
 Moreover, Rigby was assuming that, absent such discriminations, Utah Pie would have continued to sell 'Utah' brand frozen pies at not less than $3.70 per dozen in 1960 and 1961, which would have made the prices of sellers in the market area, other than the appellants, more competitive, and they would undoubtedly have increased their sales of frozen pies.
 
 
 94
 We believe tha conclusion is inescapable that the failure of Utah Pie to maintain in 1960 and 1961 the market share percentage of frozen pies, exclusive of controlled and private brand frozen pies, sold by it and the appellants in the Salt Lake City market area in 1958, which on the basis employed by the accountant was 70.41 per cent, was due in a very large part to the fact that Associated Grocers, theretofore the largest purchaser of 'Utah' brand frozen pies in such market area, purchased only an insignificant number of 'Utah' brand pies in 1960 and 1961; and that it was not due in substantial part to any relative increase of sales in such market area in 1960 and 1961 by the appellants of their brands of frozen pies.
 
 
 95
 The market share percentage decrease of only 11.72 per cent in 1959 of Utah Pie, when Associated Grocers was a large volume buyer of 'Utah' brand pies and the much larger market share percentage decreases of 30.13 per cent in 1960 and 36.77 per cent in 1961, years in which Associated Grocers purchased only a very small number of 'Utah' brand pies, bears out our conclusion.
 
 
 96
 The fact is unescapable that Utah Pie's 'Utah' brand, which was the volume leader in such market area in 1958 and 1959, was supplanted by Utah Pie's 'Frost 'N' Flame,' which became the volume leader in 1960 and continued to be in 1961.
 
 
 97
 The accountant, having determined that Utah Pie's market share percentage of frozen pies sold in the Salt Lake City market area by it and the appellants in 1959, exclusive of controlled and private brand frozen pies, was 58.69 per cent, divided the total number of frozen pies, exclusive of controlled and private brand frozen pies, sold in such market area by Utah Pie in 1959, which was 47,127 dozens, by such percentage to ascertain the number of frozen pies in dozens which equalled one per cent. He then multiplied the quotient by 100 to ascertain 100 per cent in dozens, which was 80,298 dozens. He then multiplied 80,298 by 70.41 to ascertain the number of dozens of frozen pies, exclusive of controlled and private brand frozen pies, which Utah Pie would have sold in 1959 in such market area, had it maintained in 1959 the 70.41 per cent market share it had in 1958, which he found to be 56,538 dozens. By subtracting the actual number of dozens sold in 1959 from 56,538, he arrived at the number of sales in dozens of frozen pies Utah Pie claimed it lost in that year because of the price discriminations of the appellants, which was 9,411 dozens.
 
 
 98
 By like calculation he found that the sales loss claimed by Utah Pie of 'Utah' brand frozen pies in such market area in 1960 was 34,218 dozens, and in 1961 was 34,350 dozens. (See Exhibit 96, page 2.)
 
 
 99
 Basing his calculations on a cost study of frozen pies sold by Utah Pie, made by a Mr. Zimmerman for the appellants, he arrived at what he said was a weighted average of Utah Pie's 'actual cost of manufacture' of 'Utah' brand pies. He then computed the amount of gross profits Utah Pie would have realized, had it sold such additional frozen pies at prices of $4.30, $4.10, $3.90, and $3.70 per dozen, respectively, by deducting such cost of manufacture from such sales prices, and he then allocated a share of such gross profits as damages to each of the appellants. (See Exhibit 96, page 5 and Exhibit 95, part (A).)
 
 
 100
 No deductions usually taken from gross profits in arriving at net profits were considered, since Gaylen S. Rigby testified that had Utah Pie made such additional sales there would have been no increase in its overhead.
 
 
 101
 Gaylen S. Rigby testified that in his opinion Utah Pie, by reason of the price discriminations of the appellants, suffered damages for injury to its good will of $75,000. He gave no underlying facts, aside from hypothetical predictions of what would have happened, absent such discriminations, for his claim of damages for injury to good will, and gave no basis for allocating such claimed damages among appellants. Under instructions from counsel for Utah Pie, the accountant allocated such claimed damages equally among the appellants. (See Exhibit 95, part (G).)
 
 
 102
 It well be observed that the jury returned a verdict against Carnation of $29,277, which is exactly $10,000 more than the $19,277 damages allocated to Carnation on the $3.70 per dozen sales price basis in part (A) of Exhibit 95; that it returned a verdict of $24,994 against Continental, which is exactly $10,000 more than the $14,994 damages allocated to Continental on the $3.70 per dozen sales price basis in part (A) of Exhibit 95; and that it returned a verdict of $44,197 against Pet, which is exactly $10,000 more than the $34,197 damages allocated to Pet on the $3.70 per dozen sales price basis in part (A) of Exhibit 95. (See also Exhibit 96, page 5.)
 
 
 103
 The only damages allocated equally among the appellants were the claimed damages for injury to good will in part (G) of Exhibit 95. Hence, it is perfectly clear that the jury based its damages award for loss of sales on the last line of part (A) of Exhibit 95.
 
 
 104
 In presenting its case for loss of profits in part (A) of Exhibit 95, Utah Pie treated all of the price discriminations of the several appellants as constituent parts of a single whole, or as joint acts of the appellants. That would have been proper, had Utah Pie established its conspiracy claim, but the jury returned a separate verdict against Utah Pie on its conspiracy claim against all three of the appellants.
 
 
 105
 Hence, each appellant was liable only for the injuries caused by its first 2(a) violation and its 2(a) violations thereafter, and it was not liable for injuries caused by the 2(a) violations of the other two appellants.
 
 
 106
 From the foregoing and the charts set out in Appendices II, III, IV, V, VII, and VIII, annexed to our former opinion, and the tables which are set forth in that opinion at pages 134, 135, 137, and 144 of 349 F.2d, the following will appear:
 
 
 107
 Utah Pie was the first and arch price cutter in the Salt Lake City market area; it engaged in price cutting to obtain and retain frozen pie customers in the Salt Lake City market area continuously from the time it entered the frozen pie business to the end of the period here involved; lower prices were the principal means it employed to obtain and hold customers, and it used such means very effectively. Through them it obtained the patronage of the three largest retailers in such market area. By the use of controlled labels, it effectively tied two of such major retailers to it as their sole supplier of frozen pies.
 
 
 108
 It very substantially increased its sales volume in such market area from year to year, including the year 1962, and in each of the years 1958 to 1961, inclusive, it had a very high percentage share of the total sales volume in such market area.
 
 
 109
 However, as we stated, supra, we understand the decision of the Supreme Court to hold that Utah Pie had the right so to reduce its prices for its frozen pies, so long as it did not violate 2(a) of the Clayton Act, as amended by the Robinson-Patman Act.
 
 
 110
 Utah Pie's claims of damages suffered by it, reflected in parts (B), (C), and (D) of Utah Pie's Exhibit 95, require little discussion. They were based on conjecture and were highly speculative in character. Its proof, in our opinion, did not establish that it suffered any damages in the categories reflected in such items. The jury evidently so regarded Utah Pie's proof with respect to those items, because it awarded no damages to Utah Pie on any of its claims reflected in parts (B), (C), and (D).
 
 
 111
 Safeway did not purchase any 'Bel-air' frozed fruit pies from Utah Pie in 1959, 1960, and 1961. That, because Safeway was not able to persuade Utah Pie to install means and procedures that would effect uniform quality control and insure that the specifications and standards Safeway required of a manufacturer with respect to its 'Bel-air' frozen fruit pies would be met and that defective pies bearing the 'Bel-air' label would not reach Safeway's shelves.
 
 
 112
 Safeway did purchase 'Bel-air' frozen mince and pumpkin pies from Utah Pie in 1960 and 1961. During 1960, Safeway discovered that the 'Bel-air' frozen pumpkin pies delivered to it by Utah Pie exceeded the maximum moisture content specified by Safeway and agreed to by Utah Pie and further discovered that the 'Bel-air' frozen pumpkin and mince pies delivered to it by Utah Pie did not meet the requirements with respect to ingredients specified by Safeway and agreed to by Utah Pie. Safeway again, without avail, urged Utah Pie to install means and procedures in its plant that would insure quality control and the delivery to it of frozen pies that would meet the 'Bel-air' quality standards insisted on by Safeway.
 
 
 113
 Moreover, prior to December 1960, Safeway requested Utah Pie to install and Utah Pie agreed to install a coding device by which Safeway could pinpoint the date and time of production of defective pies delivered to it by Utah Pie, but Utah Pie failed to install such coding device, and as late as August 1961, advised Safeway it had not taken any steps so to do.
 
 
 114
 The primary reason that Safeway was insisting on Utah Pie installing such means and procedures to insure quality control was that Safeway was unwilling to risk damage to the fine reputation it was building up for 'Bel-air' frozen fruit pies by the maintenance of the continued high quality of such pies through unwitting sales by it of 'Bel-air' pies, the quality of which fell below such high standards.
 
 
 115
 In 1960, Safeway purchased 4,608.5 dozen 'Bel-air' frozen mince pies and 5,336.5 dozen 'Bel-air' frozen pumpkin pies from Utah Pie. However, in 1961, Safeway purchased only 50 dozen 'Bel-air' frozen mince pies, but it purchased 6,483 dozen 'Bel-air' frozen pumpkin pies from Utah Pie in that year. The reasons for the decrease in the number of frozen mince pies purchased in 1961 were these: Safeway requested Utah Pie to pack the frozen mince pies to be made by it for Safeway in 1961 in a new type of carton. Utah, Pie advised Safeway it would not do so, unless it was given safeway's frozen fruit pie business, then going to Pet. That Safeway would not do, for the reasons indicated above. As a result, Safeway purchased only 50 dozen frozen mince pies from Utah Pie in 1961, just enough to Permit it to use up the old cartons and shipping cases it had on hand.
 
 
 116
 Thus, it will be seen that Safeway's unwillingness to purchase frozen 'Bel-air' pies from Utah Pie was due to Utah Pie's refusal to meet Safeway's requirements with respect to quality controls, coding device, and type of carton used.
 
 
 117
 The facts stated above, with respect to the reasons Safeway did not purchase any frozen fruit pies from Utah Pie and purchased only a few frozen mince pies from it in 1961, in large part appear from the testimony of Alan W. Young, Manager of Safeway's Frozen Food Department. But we do not rest our statement on his testimony. The facts we stated were clearly and fully established by written correspondence in the form of letters from Young to Utah Pie and Utah Pie to Young, introduced as exhibits in the trial below, and which Utah Pie wholly failed to show were in any particular either inaccurate or incomplete.
 
 
 118
 While Safeway would not purchase frozen fruit pies packed under its 'Bel-air' label from Utah Pie for the reasons stated above, it was a large purchaser of other frozen pies from Utah Pie. Utah Pie's sales of other frozen pies to Safeway were approximately 31,500 dozen in 1958, 16,500 dozen in 1959, 22,000 dozen in 1960, and 18,000 dozen in 1961.
 
 
 119
 With respect to Utah Pie's claim for damages, reflected in part (E) or Exhibit 95, we think it quite clear that becauset Utah Pie was unwilling to meet Safeway's requirements as to quality control and coding device, as stated above, Safeway would not have purchased from Utah Pie 'Bel-air' frozen fruit pies at any price; and because 'Bel-air' frozen pumpkin pies delivered to Safeway by Utah Pie at times did not meet Safeway's requirements as to maximum moisture content, and 'Bel-air' frozen mince pies delivered by Utah Pie to Safeway at times did not meet Safeway's specifications as to ingredients, and Utah Pie's unwillingness to install quality controls, Safeway would not have paid its contract price to Utah Pie for 'Bel-air' frozen pumpkin and mince pies.
 
 
 120
 The jury apparently reached the same conclusions, because it awarded no damages to Utah Pie on its part (E) claim.
 
 
 121
 Utah Pie's claim for damages, reflected in part (F) of Exhibit 95, is predicated on the assumption that Utah Pie would have sold as many 'Utah' brand pies in the Salt Lake City market area at prices of $3.70 or more per dozen as it did at $3.10 to $3.60 per dozen. That assumption also is conjectural and speculative aqd the jury apparently so concluded, because it did not award Utah Pie damages on its part (F) claim.
 
 
 122
 We will refer further to Exhibit 95 and the exhibits on which it is based when we take up separtely the appeals of each appellant.
 
 
 123
 We shall next consider each of the several appeals separately.
 
 II
 No. 7306-- The Continental Appeals
 
 124
 Continental's counterclaim was based upon the differences between the prices for which Utah Pie systematically sold frozen pies to retail chain stores and the substantially higher prices for which it sold them to other customers in the Salt Lake City market area. Such differences resulted from the sales by Utah Pie under private and controlled labels to favored customers, which began late in 1959. Under those labels, Utah Pie sold its only size, grade, and quality of pies to the large favored buyers at substantially lower prices than other buyers were required to pay for Utah Pie's regular 'Utah' brand.
 
 
 125
 For example, in mid-1960 Utah Pie was selling its 'Utah' brand frozen pie for $3.60 per dozen, while it was selling an identical pie under its 'frost 'N' Flame' brand exclusively to Associated Grocers at $3 per dozen. And on April 4, 1960, Utah Pie by letter offered to sell Safeway, packed under its 'Bel-air' label and delivered to its warehouse in Salt Lake City, frozen apple pies at $3 per dozen and frozen cherry and boysenberry pies at $3.30 per dozen. It was also selling at that time its 'Sonny Boy' brand frozen pies for $2.88 per dozen, f.o.b. Salt Lake City, for delivery to buyers in Spokane.
 
 
 126
 Beginning late in 1959 and continuing thereafter, during the period here involved, Utah Pie sold Associated Grocers frozen pies under its controlled label, 'Frost 'N' Flame.' That pie, identical with the pie marketed by Utah Pie under its 'Utah' brand, was exclusive with Associated Grocers and was sold at a price 50 to 60 cents per dozen less than Utah Pie charged nonfavored competing purchasers for its 'Utah' brand. Associated Grocers' tremendous competitive advantage, thus attained, caused it to support 'frost 'N' Flame' almost exclusively in its advertising. It also guaranteed Utah Pie's dominant position in the market by foreclosing effective competition through sales by others to its largest buyer. 'Frost 'N' Flame' quickly replaced 'Utah' brand as the leading brand in the Salt Lack City market area.
 
 
 127
 Utah Pie also produced pumpkin and mince pies for Safeway, the second largest buyer, under Safeway's private label 'Bel-air' brand, at prices substantially below those it charged for its identical pie sold under its 'Utah' label to nonfavored competing stores. Utah Pie also continually offered Safeway a preferentially low price on its frozen fruit pies packed under its 'Bel-air' label. Safeway rejected those offers, not because of price, but for the reasons fully set out, supra, in this opinion. In 1960, its first year of sales of 'Bel-air' mince and pumpkin pies to Safeway, Utah Pie charged what it later said itself was a 'rock bottom' price, with the hope that it would induce Safeway to drop its then supplier, Pet Milk, in favor of Utah Pie.
 
 
 128
 In 1961, Utah Pie began selling its controlled label 'Mayfresh' pies to Grand Central-American Stores, another of the four largest buyers in the Salt Lake City market area.
 
 
 129
 The adverse impact on Utah Pie's competitors was very substantial. From the time Utah Pie gave Associated Grocers its controlled label preference, Continental was unable to sell Associated Grocers a single pie. After Utah Pie began its controlled label sales to Grand Central Stores, Continental was unable to sell that company, and when the arrangement was extended early in 1962 to American Food Stores, which had been acquired by Grand Central, Continental lost the only chain that had been a more or less steady customer. Similarly, as to Safeway, Continental was unable to make a single sale to it until June 1961. In that month it made a sale to Safeway's food stores in Salt Lake City, which we will deal with more particularly later.
 
 
 130
 Continental enjoyed substantial sales in the Salt Lack City market area in 1957, but from 1958 to 1960, inclusive, it was a negligible competitor in that market area. With the advent of Utah Pie as a competitor in 1958, Continental's volume in dozens fell to 754 and its market share to 1.3 per cent. In 1959, its volume of sales in dozens was 3,182 and its market share 2.9 per cent. In 1960, its volume of sales in dozens was 3,350 and its market share 1.8 per cent.[13] In 1961, its sales increased and its total volume of sales in dozens in that year was 18,799.5 and its market share 8.3 per cent, but by the beginning of the fourth quarter of 1960, Continental had reduced the cost of its pies laid down in Salt Lake City to a point where it could more nearly compete with Utah Pie's prices in the Slat Lake City market area.
 
 
 131
 After the entry of Utah Pie into the Salt Lake City market in 1957, with its lower priced pies, Continental, because of its higher costs of production, and transportation, was unable to keep its prices even for its smaller pie competitive with Utah Pie's prices. In 1960, with the advent of Utah Pie's controlled and private label prices, Continental ceased to maintain a sales representative in the Salt Lake City market area and was virtually out of that market. However, Continental continued in an effort to reduce its costs of production in order to become competitive. In 1960, it was successful in locating a 'co-packing' operation in the heart of the California fruit growing region, which permitted fruit to be processed directly from the trees into the finished pie, without large intermediate packaging, storing, and shipping expenses. By such efforts, Continental was able to reduce its cost of apple pies laid down in Salt Lake City from approximately $3.75 per dozen in 1958 to approximately.$2.80 per dozen in the second quarter of 1961. It was also able to reduce its costs of other flavors laid down in Salt Lake City in comparable amounts. Having thus reduced its costs, Continental was again in a position to offer its 'Morton' brand pies to buyers in the Salt Lake City market area at prices which it hoped might prove to be competitive. In October 1960, Continental contracted with a Salt Lake City food broker in an effort to resume distribution of its full line of 'Morton' brand frozen food products in the Salt Lake City market. For seven months, from November 1960 to June 1961, the broker attempted to sell Continental frozen pies at prices generally competitive with Utah Pie's 'Utah' brand.
 
 
 132
 During that period the broker called on the trade throughout the Salt Lake City market area, offering various short-term price concessions in the form of advertising allowances on frozen pies, as well as other products in the Continental line. On the frozen pies, these price concessions ranged from $1.20 per dozen off the $4.50 list price on mince pies to 84 and 70 cents per dozen off the $4.00 list price on apple, cherry, and boysenberry pies, respectively. At these net prices, Continental was able to make only a total of seven sales to three small buyers in the outlying areas of Ogden, Boise, and Pocatello. It could not make sales to the major buyers, all located in Salt Lake City. The few sales it made did not adversely affect Utah Pie. During those seven months, Continental's best price offers, made on the price-per-ounce basis used by professional buyers in comparing prices, were competitive with prices offered by Utah Pie on its 'Utah' brand. By June 1961, it seemed apparent that if Continental was to recapture any portion of the market, it had to make better offers.
 
 
 133
 Continental was unable to sell to small buyers in the Salt Lake City market area, because they lacked the refrigerated storage space necessary to buy direct from Continental. Continental could sell not less than a quarter of a truckload. Utah Pie, with its plant in Salt Lake City, was the only manufacturer who could feasibly sell directly to the small buyers. Of the largest buyers, Associated Grocers was handling 'Frost 'N' Flame' brand at $3.10 per dozen, the lowest price on the market; Grand Central was about to close a deal with Utah Pie for its controlled label, 'Mayfresh,' at the same prices charged Associated Grocers; and Safeway was buring its 'Bel-air' brand frozen fruit pies exclusively from Pet Milk, from whom it could purchase three brands, including its own private label, in combined truckload shipments. Confronted with that situation, continental's broker recommended that it meet the price being charged to Associated Grocers and offered to Grand Central, by offering apple pies at $2.85 per dozen on full truck quantities. This was approximately the ounce-for-ounce equivalent of Utah Pie's $3.10 per dozen price. Indeed, Continental's price was 1.08 cents per ounce of its pies, and Utah Pie's price for its pies was 1.07 cents per ounce. In comparing Continental's prices with Utah Pie's prices, the fact that Continental's pies were 22 ounces in weight and Utah Pie's pies were 24 ounces in weight should be taken into consideration. Professional buyers evaluate competing offers on a price-per-ounce basis, although retail purchasers do not always give attention to the difference in the size of pies. Moreover, Continental's price was for full truck order, only, while Utah Pie's price applied to orders of any size, down to a few dozen.
 
 
 134
 Continental approved the recommendation of its broker, and a $2.85 to $2.89 delivered price, depending on quantity ordered, for frozen apple pies was offered for a two-week period to a few buyers potentially able to buy from Continental. At the same time, Continental extended on a continuing basis for the Salt Lake City market area an offer of 30 cents per dozen freight allowance. At those prices, Continental made sales to American Food Stores in Ogden and to Associated Grocers, as small independent branch in Pocatello, both of which had previously purchased 'Morton' pies, and at the time of the sales were not purchasing from Utah Pie.
 
 
 135
 In June 1961, the merchandising manager for Safeway's food stores in Salt Lake City purchased 6,250 dozen frozen apple pies, their requirement for five weeks, from Continental,[14] and in July 1961, Grocers, wholesale of Salt Lake City, a small wholesaler just starting in business, ordered 1,000 dozen frozen pies from Continental.
 
 
 136
 Utah Pie responded to Continental's offer, which lasted only two weeks, and was once renewed a month later for the same period, by reducing its price on all of its 24-ounce apple pies, whatever the brand name, to $2.75 per dozen and offering all the customers unlimited quantities, to be delivered in lots of any size. It continued so to do until December 1, 1961, when it raised its price to $2.95 per dozen. Gaylen S. Rigby testified that Utah Pie realized a profit in its sales of frozen apple pies at $2.75 per dozen.
 
 
 137
 When Continental learned of Utah Pie's price reduction, and the merchandising manager for Safeway's food stores in Salt Lake City urged it to further reduce its price, it agreed with him to cancel an order he had already placed at the $2.85 price; and also offered to cancel another order placed by American Food Stores, rather than reduce its price to Utah Pie's offer, but American Food Stores did not elect to cancel its order.
 
 
 138
 During the period 1958 to 1962, inclusive, in the Salt Lake City market area, Continental reached its highest sales volume in June and July 1961. Thereafter, its sales volume continuously decreased through 1962. In 1962, its sales volume was 8,685 dozen less than its 1961 volume. June and July 1961 were also high sales volume months for Utah Pie, higher than any of the five preceding months and many other earlier months; and from July 1961, on through 1962, its sales volume continued to increase. Its sales volume reached a new annual high in 1962, when it showed an increase of 26,968.3 dozen over 1961. Thus, it will be seen that Utah Pie effectively maintained its dominant position and discouraged further efforts by Continental to meet the low prices which Utah Pie continued to maintain throughout 1961 and 1962.
 
 
 139
 Continental was able in 1961 to increase its volume to 18,795.5 dozen and its market share percentage to 8.3, but in 1962 its volume dropped back to 10,114.5 dozen, while Utah Pie's volume in that year was 129,658.3 dozen, an increase of 26,968.3 dozen over 1961. The record does not reflect facts from which the market share percentage can be computed in 1962.
 
 
 140
 The following table graphically shows a comparison of Utah Pie's and Continental's respective sales volume and market share percentage for the years 1958 to 1961, inclusive, and the sales volume for 1962[15] in the Salt Lake City market area.
 
 
 141
 Sales Volume
 in Dozens % of Market
 ------------ -----------
1958 (Utah Pie 37,969.5 66.5
 (Continental 754 1.3
1959 (Utah Pie 38,372 34.3
 (Continental 3,182 2.9
1960 (Utah Pie 83,894 45.5
 (Continental 3,350 1.8
1961 (Utah Pie 102,690 45.3
 (Continental 18,799.5 8.3
1962 (Utah Pie 129,658.3
 (Continental 10,114.5
 
 
 142
 The evidence clearly established that in the Salt City market area during the period 1958, 1959, 1960, and the first five months of 1961, Continental generated no competition with Utah Pie and did not cause Utah Pie to reduce its prices for its frozen pies. Gaylen S. Rigby so conceded in his testimony at the trial below.[16] Those facts no doubt caused the Supreme Court to observe in its opinion in these cases in Utah Pie Co. v. Continental Baking Co., supra, at page 698 at page 1334 of 87 S.Ct: 'Then in June 1961, it took the steps which are the heart of petitioner's (Utah Pie) complaint against it (Continental).'
 
 
 143
 Hence, there were no 2(a) violations by Continental in the Salt Lake City market area in the years 1958, 1959, 1960, and the first five months of 1961, but the proof of Utah Pie's damage claims, reflected in part (A) of Exhibit 95 and the exhibits in Appendix A on which part (A) of Exhibit 95 is based, particularly pages 1, 2, and 3 of Exhibit 96, were predicated on the assumption that Continental committed violations of 2(a) in 1959 and 1960, which caused loss of sales by Utah Pie, which sales it would have made at prices of $3.70 per dozen or greater. Such assumption was clearly unfounded and it was manifest error to permit part (A) of Exhibit 95 and its supporting exhibits to received in evidence against Continental.
 
 
 144
 Aside from the damages awarded by the juty to Utah Pie for loss of good will, the jury's verdicts in favor of Utah Pie were all based on part (A) of Exhibit 95 and its supporting exhibits.
 
 
 145
 Since Continental's 2(a) violations were confined to two months in 1961, whereas Pet's and Carnation's 2(a) violations extended over a much longer period of time, it was grossly unfair to Continental for the accountant, acting pursuant to the direction of counsel for Utah Pie, arbitrarily to allocate to Continental the same amount for loss of good will as it did to each of the other appellants. Hence, the jury's award against Continental, based on such allocation, of the same amount awarded against Pet and Carnation for loss of good will was grossly unfair and, likewise, was not supported by any underlying factual basis.
 
 
 146
 In view of the Supreme Court's decision in these cases, we must assume that Continental's offers and sales in June and July 1961 did violate 2(a). That being so, we do not think it can be said as a matter of law that Utah Pie suffered no damages proximately caused by such violation.
 
 
 147
 The record clearly established and the jury found that there was no conspiracy, no concert of action by the appellants. Each appellant pursued its own course and competed with the other two.
 
 
 148
 What we have said clearly demonstrates the reasons, the conspiracy charge having been eliminated, why the cases should be presented separately against each appellant, even though consolidated for trial. In other words, to avoid confusion and to be fair to each of the appellants, Utah Pie, to meet its burden of proof,[17] should introduce:
 
 
 149
 1. Its evidence of general application in all three cases;
 
 
 150
 2. The proof on which it relies to show violations of 2(a) by one of the appellants;
 
 
 151
 3. The proof on which it relies to establish that it was damaged by such violation by such appellant;
 
 
 152
 4. Proof by which the jury could make a reasonably approximate estimate of the amount of such damages.
 
 
 153
 Then such appellant should present its defense to the claim against it.
 
 
 154
 The same course should then be followed as to the 2(a) claims against the other two appellants.
 
 
 155
 This means that Utah Pie must prove its damages against each appellant separately and should not be permitted to introduce evidence to establish a claim of damages in one lump sum and then distribute it to the several appellants.
 
 
 156
 Utah Pie's claim of damages against Continental in the Salt Lake City market area should be definitely tied to its 2 violations which occurred in June and July 1961.
 
 
 157
 We think if the order of proof we have indicated is followed, Continental's counterclaim could also be presented when Continental presents its defense to Utah Pie's 2(a) claim against it.
 
 
 158
 We deem no useful purpose would be served by a discussion by us of the instructions offered and refused, or those given. No doubt, on a new trial the charge to the jury will be recast to conform to the views expressed in the opinion of the Supreme Court and in this opinion.
 
 
 159
 Finally, we do not think, in view of the course these cases have taken, that Continental should be held debarred from proving full compensatory damages on its conterclaim.
 
 III
 No. 7309-- The Pet Appeal
 
 160
 Pet is a corporation engaged in the manufacture and sale of food products, including frozen pies. Its main office is in St. Louis Missouri. Its frozen pie manufacturing plants are located in Frankfort, Michigan, Chambersburg, Pennsylvania, and Fresno, California.
 
 
 161
 Pet sells and distributes its pies from its three plants, throughout the United States. From 1958 to 1962, inclusive, it was a competitor of Utah Pie in the Salt Lake City market area. Pet entered the frozen pie business in 1955, by the acquisition of a frozen pie plant at Beulah, Michigan. Initially, its pies were made in four flavors and distributed in a relatively small north central territory, the Detroit-Chicago-Milwaukee area. In order to expand its frozen pie business nation-wide, Pet moved its plant from Beulah to Frankfort, and then in 1956 acquired its plant at Fresno, and in 1957 its plant at Chambersburg. It marketed its pies under the brand 'Pet-Ritz.' It added new flavors and undertook to accelerate consumer acceptance and demand through an extensive advertising campaign, which emphasized the quality of its pies. This advertising included advertisements in local newspapers, distribution of coupons that might be used in purchasing pies, and demonstrations in grocery stores to show how easily the pies could be prepared for consumption. It also included a large expenditure for advertising on a half-hour television program, which starred Red Skelton.
 
 
 162
 Soon after Pet entered the frozen pie industry, the nature of the market began to change. As frozen pies became more and more in demand, numerous regional or local companies, such as Utah Pie, entered the business. Because of the freight advantage which they had over the national companies like Pet, whose products usually had to be shipped into a region from a considerable distance, the local and regional companies were able to sell at lower prices than the national companies had been charging. Emphasis in many regional markets shifted from quality to price, and price became the principal factor of competition. With the large increase in volume of sales of frozen pies and the increase of price competition, prices of frozen pies declined throughout the United States.
 
 
 163
 During 1957 and 1958, while prices were declining and the market was rapidly expanding, Pet's sales of frozen pies did not keep pace with the expanding market. In the Salt Lake City market area, total sales in 1959 were 1.96 times total sales in 1958, while sales of 'Pet-Ritz' pies were 1.52 times their sales in 1958; total sales in 1960 were 1.64 times total sales in 1959, while 'Pet-Ritz' sales were 0.58 times their sales in 1959; and total sales in 1961 were 1.24 times total sales in 1960, while 'Pet-Ritz' sales were 0.46 times their sales in 1960.
 
 
 164
 During the period from 1958 to 1961, inclusive, the total sales of 'Pet-Ritz' pies were the following percentages of all brands of frozen fruit pies sold in the Salt Lake City market area: 1958-- 16.4 per cent; 1959-- 12.7 per cent; 1960-- 4.5 per cent; 1961-- 1.7 per cent. The decrease was due to the fact that other brands were being sold below the 'Pet-Ritz' price in that market.
 
 
 165
 When Pet realized that advertising efforts were not enough to check its continuing decrease in sales, it made William N. Harsha, who had been the Managing Director of Pet's Canadian corporation, General Manager of the Pet-Ritz Frozen Foods Division and directed him to study its operations and financial and production problems. As a result of such study, Harsha decided to curtail the advertising and effect economies by eliminating duplication in overhead, increasing processing efficiency, improving production methods, reducing warehouse costs, and reducing freight costs by better scheduling of deliveries.
 
 
 166
 Pet also decided to make an analysis of the frozen pie market to determine what kind of pie the housewife preferred. It was then known that the housewife was price conscious, but Pet, having spent large sums in advertising the 'Pet-Ritz' brand as a quality product, did not want to reduce the quality of that pie to enable it to compete with lower priced pies. As a part of the effort to analyze the market, a research director was employed, who began his studies in June 1959. Soon thereafter, the Market Research Corporation of America was engaged by Pet to make a study to help it decide whether or not to add a smaller and lighter economy brand of frozen pie. The results of these studies indicated that there was a market for a frozen economy pie and Pet introduced its 'Swiss Miss' pie in Denver in April 1960, and elsewhere in the United States, including Utah, in August 1960. 'Swiss Miss' is an eight-inch, 20-ounce pie. Utah Pie's brands are all eight-inch, 24-ounce pies. While it did not enable Pet to fully meet the price competition, it enabled it to compete more effectively, regain some of its major chain customers, and improve the profit picture of its frozen foods operation.
 
 
 167
 Simultaneously with Pet's efforts to cut costs and improve volume of sales, in 1958 it began to reduce its advertising expenditures for frozen pies. From $866,116 in 1959, its advertising expenditures were reduced to $337,510 in fiscal 1961, and to $42,562 in fiscal 1962.[18]
 
 
 168
 In addition to adding the lighter weight, lower priced 'Swiss Miss' to its line of frozen pies to improve its competitive position, Pet also entered into negotiations with Safeway for the production of frozen fruit pies under the 'Bel-air' label. It sold Safeway 25,462.5 dozen 'Bel-air' frozen fruit pies in 1959.
 
 
 169
 On December 24, 1959, Pet and Safeway entered into a contract whereby Pet agreed to furnish Safeway with its requirements of frozen fruit pies for its nation-wide chain of food stores for the year 1960. Under the contract, Safeway agreed to purchase and Pet agreed to furnish during such year not less than 500,000 dozen and not more than 1,000,000 dozen frozen fruit pies, and shipments were to be made from the plant of Pet nearest to the point of delivery to Safeway.
 
 
 170
 The prices stipulated in the contract for the various frozen fruit pies and for frozen mince and pumpkin pies were less than those for which Pet was selling substantially the same product to customers other than Safeway.
 
 
 171
 Safeway regularly followed the practice of requiring the sellers of commodities to it to justify any price differentials allowed Safeway by showing a cost difference. Consonant with that requirement, Pet, by the terms of the contract, represented and warranted to Safeway that the differentials thus allowed Safeway in the contract only made due allowance for differences in the cost of manufacture, sale, or delivery resulting from differing methods or quantities in which such pies would be sold or delivered to Safeway. (See 15 U.S.C.A. 13(a).)
 
 
 172
 The contract further provided that on or about July 1, 1960, Pet would review its pricing and cost structures to determine whether the prices stipulated in the contract should be revised upward to reflect possible changes in the cost of manufacture, sale, or delivery necessary to justify such differentials.
 
 
 173
 The contract required Pet to maintain adequate quality controls, to permit inspection by Safeway's representative in Pet's plants during the course of production, processing, manufacture, and storage of the pies to be delivered to Safeway under the contract. It further required Pet to furnish to Safeway sample pies marked as to the time, date, or lot from which they were drawn, and gave Safeway the right to reject any lot or any pies which did not meet Safeway's specifications.
 
 
 174
 Pet furnished Safeway satisfactory proof justifying the differentials allowed it. At the trial below, Pet introduced evidence for the purpose of showing that the differentials allowed Safeway under the contract were justified by differences in the cost of manufacture, sale, or delivery of pies produced and sold by Pet to Safeway, resulting from different methods employed or quantities sold and delivered. The Supreme Court, however, held that such proof was incomplete and inadequate to establish justification for such differentials. (See 386 U.S. 694, 695, 87 S.Ct. 1326, 18 L.Ed.2d 406.) However, Pet will have an opportunity to undertake to introduce evidence at a new trial that will meet the requirements of adequate proof of justification laid down by the Supreme Court.
 
 
 175
 The 'Pet-Ritz' frozen pies were always sold in the Salt Lake City market area at prices substantially higher than the prices at which the frozen pies of Utah Pie, all of which were of the same weight and quality as 'Pet-Ritz,' were sold by Utah Pie in such market area.
 
 
 176
 In August 1960, when the first 'Swiss Miss' frozen apple pie was sold in the Salt Lake City market area, its price was $3.29 per dozen. At the same time, the larger and heavier 'Frost 'N' Flame' frozen apple pie of Utah pie was sold at a price of $3.00 per dozen. Thereafter, during the period covered by this action, the 'Swiss Miss' frozen apple pie ranged in price from $3.24 to $3.38 per dozen, while the 'Frost 'N' Flame' frozen apple pie ranged in price from $2.75 to $3.10 per dozen.
 
 
 177
 Except during the periods or months hereinafter noted in this paragraph, the prices at which the 'Swiss Miss' frozen pies were sold were always higher than the prices at which the larger and heavier 'Frost 'N' Flame' frozen pies were sold in the Salt Lake City market area; and even in such periods or months the prices of 'Swiss Miss' frozen pies were higher than the prices of 'Frost 'N' Flame' frozen pies on an ounce-for-ounce basis; and professional buyers for resale always take into consideration differences in size and weight. In the period September 1960 through November 1961, the price of the 'Swiss Miss' frozen cherry pie, if difference in weight be disregarded, was lower than the price of 'Frost 'N' Flame' frozen cherry pie in such market area. That was true of 'Swiss Miss' frozen peach pie in August and October 1960, and January, February, March, June, and September, 1961, and of 'Swiss Miss' frozen boysenberry pie from August 1960, through December 1961. It was never true of 'Swiss Miss' frozen apple pie.
 
 
 178
 Utah Pie's Exhibit 112 reflects the price lists and special deals offered by Pet in Wyoming, Washington, Utah, Oregon, Montana, Idaho, Colorado, southern California, and northern California in 1958, 1959, 1960, and 1961. A chart annexed to our former opinion as Appendix II (see 349 F.2d 159, 160) analyzes month by month the lowest absolute price offered by Pet for apple pie in each of such market areas. By lowest absolute price is meant the list price, less any deals offered, whether direct discounts from the invoice price or advertising allowances. Apple pie figures are used, because it is the volume leader, sells at the lowest price of the frozen pies, and is the price indicator. That chart shows the following:
 
 
 179
 Pet's absolute price for apple pie was uniform in Wyoming, Utah, Montana, Idaho, and Colorado from January 1958 through November 1959; at no time during that period was Pet's price in Utah lower than its prices in any of the other market areas; and during such period Pet's lowest price was always in northern California, southern California, Washington, or Oregon.
 
 
 180
 In December 1959, Pet's Utah price was $3.80 per dozen, while its price in Wyoming, Washington, Oregon, Montana, and Colorado was $4.00 per dozen, but in that same month Pet offered apple pie in northern California for $3.70 per dozen and in southern California for $3.60 per dozen.
 
 
 181
 During four months in 1960, Pet charged less for apple pie in Utah than it did in some of its other market areas, but at all times during 1960, Pet's Utah price was higher than its price in southern California and was the same or higher than its price in northern California.
 
 
 182
 In January and February 1961, Pet's lowest offering price for apple pie was $3.70 per dozen and was made in Utah, Montana, and Colorado; in March and April 1961, Pet's lowest offering price for apple pie was $3.56 per dozen and was made in Utah, Montana, and Idaho; and from May through August 1961, Pet's apple pie price in Utah was the same or higher than its apple pie prices in its other market areas.
 
 
 183
 Thus, in only nine months of the 44 months here involved, was Pet's price for apple pie lower in Utah than in any of its other market areas, and in only four months, January, February, March, and April, 1961, was Pet's price in Utah the lowest of any of its other market areas.
 
 
 184
 Furthermore, a comparison of Utah Pie's absolute apple pie prices, shown by its Exhibit 91, and set forth in a chart annexed to our former opinion as Appendix III (see 349 F.2d 160), and Pet's lowest absolute prices, reflected in Appendix II to our former opinion, shows that at no time during the 44-month period of May 1958 through December 1961 were Pet's Utah prices lower than Utah Pie's prices.
 
 
 185
 Pet introduced a machine tabulation of invoices of actual sales of frozen pies by it to its customers in seven cities in the western states, during the period from May 1958 through December 1961. The seven cities were selected because most of Pet's frozen pies sold in the western states are sold through wholesalers in those cities.
 
 
 186
 Pet's Exhibit A-40, introduced below, has particular relevancy to Utah Pie's allegation of territorial price differences, namely, that Pet charged lower prices for its frozen pies in the Salt Lake City market area than it charged in the market area in which its pies were made, or in other western market areas. It shows the lowest invoice prices at which 'Pet-Ritz' frozen apple pies were sold in Salt Lake City and the six selected cities, and we reflect the pertinent part thereof in a chart annexed hereto as Appendix B.
 
 
 187
 During the period covered by the tabulation (44 months in all), the lowest price at which 'Pet-Ritz' frozen apple pies were sold by Pet to wholesalers in Salt Lake City was lower than the lowest price at which such pies were sold by Pet to wholesalers in Los Angeles in only three months-- December 1959, March 1961, and April 1961. The following table lists such prices, as well as the lowest price at which Utah Pie sold frozen apple pies under its 'Utah' brand in Salt Lake City in the same months.
 
 
 188
 Lowest Price Charged for a Dozen Frozen Apple Pies
 --------------------------------------------------
 Pet-Ritz Utah Pie
 -------- --------
 Los Angeles Salt Lake City Salt Lake City
 ----------- -------------- --------------
December 1959 $ 3.90 $ 3.84 $ 3.60
March 1961 4.26 4.24 3.10
April 1961 4.26 4.08 3.50
 
 
 189
 During the same period, the lowest price at which 'Pet-Ritz' frozen apple pies were sold by Pet to wholesalers in Salt Lake City was lower than the lowest price at which such pies were sold by Pet to wholesalers in San Francisco in only seven months-- December 1959, August 1960, January 1961, February 1961, March 1961, and April 1961. The following table lists the lowest prices at which 'Pet-Ritz' frozen pies were sold in each of the cities during those months, and the lowest price at which Utah Pie sold its 24-ounce 'Utah' brand frozen apple pies in Salt Lake City during those months.
 
 
 190
 Lowest Price Charged for a Dozen Frozen Apple Pies
 --------------------------------------------------
 Pet-Ritz Utah Pie
 -------- --------
 San Francisco Salt Lake City Salt Lake City
 ------------- -------------- --------------
December 1959 $ 4.00 $ 3.84 $ 3.60
August 1960 4.40 4.28 3.50
September 1960 4.40 4.28 3.16
January 1961 4.40 4.28 3.43
February 1961 4.40 4.28 3.50
March 1961 4.40 4.24 3.10
April 1961 4.48 4.08 3.50
 
 
 191
 The number of 'Pet-Ritz' frozen apple pies sold in the Salt Lake City market area at such lower prices is almost inconsequential. They were as follows:
 
 
 192
 December 1959 125.0 dozen February 1961 27.5 dozen
August 1960 45.0 dozen March 1961 27.5 dozen
September 1960 52.5 dozen April 1961 25.0 dozen
 -----------
January 1961 12.5 dozen Total 315.0 dozen
 
 
 193
 The introduction of the economy 'Swiss Miss' pie by Pet to enable it to better compete with lower priced pies in various markets has been discussed earlier. One question with respect to that pie remains. Was it sold at lower prices in the Salt Lake City market area than in California, where the pies were manufactured? Utah Pie introduced no evidence whatsoever to sustain any burden of proving lower prices for 'Swiss Miss' pies in the Salt Lake City market area. The 'Swiss Miss' pie was first sold in Salt Lake City in August 1960. The present complaint was filed in September 1961. Exhibit A-40, introduced below, also shows all the actual sales of 'Swiss Miss' pies in the seven western cities mentioned above in 1960 and 1961, and we reflected the pertinent part thereof in that respect in a chart annexed to our former opinion as Appendix V (see 349 F.2d 162). During only one of the intervening 13 months was the lowest price at which the 'Swiss Miss' apple pie was sold in Salt Lake City lower than the price at which such pie was sold in San Francisco, and at no time was the price in Los Angeles higher than the lowest price in Salt Lake City. In addition, during this entire period, the price of the 'Frost 'N' Flame' pie, manufactured by Utah Pie, was always lower than the price of the lighter (by four ounces) 'Swiss Miss' pie. The following tabulation permits a comparison of the prices.
 
 
 194
 Lowest Price Per Dozen - Apple Pies
 -----------------------------------
 Swiss Miss Frost 'N' Flame
 ---------- ---------------
 Salt Lake City Los Angeles San Francisco Salt Lake City
 -------------- ----------- ------------- ---------------
1960
----
August $ 3.29 $ 3.05 $ 3.29 $ 3.00
September 3.25 3.05 3.17 3.00
October 3.25 3.05 3.17 3.10
November ---- * 3.05 3.05 3.10
December ---- 3.05 3.29 3.10
1961
----
January 3.29 3.05 ---- 3.10
February 3.25 3.05 ---- 3.10
March 3.25 3.05 ---- 3.10
April 3.25 3.05 ---- 3.10
May 3.25 3.05 3.29 3.10
June 3.25 3.05 3.21 2.75
July 3.29 3.05 3.29 2.75
August ---- ---- 3.17 2.75
* ---- indicates no sales were made in the month.
 
 
 195
 Even when Utah Pie's prices for 'Frost 'N' Flame' were down to $2.75 per dozen in July and August 1961, it made a profit on its sales thereof.
 
 
 196
 In 1958, Utah Pie sold 37,969.5 dozen frozen pies in the Salt Lake City market area, which was 66.5 per cent of the total sales volume. In 1958, Pet sold 9,336.5 dozen frozen pies in that market area, which was 16.4 per cent of the total sales volume. In 1958, neither Utah Pie nor Pet sold any 'Bel-air' pies to Safeway.
 
 
 197
 In 1959, Utah Pie sold 38,372 dozen frozen pies in that market area, which was 34.3 per cent of the total sales volume. In 1959, Pet sold 39,639 dozen frozen pies in that market area, which was 35.5 per cent of the total sales volume. However, in 1959, in that market area Utah Pie sold no 'Bel-air' frozen fruit pies to Safeway, and Pet sold in that year 25,462.5 dozen 'Bel-air' frozen fruit pies to Safeway. Pet's market share, or percentage of total sales volume in that year, with frozen fruit pies sold to Safeway excluded, was 12.7 per cent.
 
 
 198
 In 1960, Utah Pie sold 83,894 dozen frozen pies in that market area, which was 45.5 per cent of the total sales volume. In 1960, Pet sold 51,480 dozen frozen pies in that market area, which was 27.9 per cent of the total sales volume. However, in 1960, in that market area, Utah Pie sold no 'Bel-air' frozen fruit pies to Safeway, while Pet sold 22,694 dozen 'Bel-air' frozen fruit pies to Safeway, and Pet's market share, or percentage of the total sales volume, with the frozen fruit pies it sold to Safeway excluded, was 15.6 per cent.
 
 
 199
 In 1961, Utah Pie sold 102,690 dozen frozen pies in that market area, which was 45.3 per cent of the total sales volume. In 1961, Pet sold 66,786 dozen frozen pies in that market area, which was 29.4 per cent of the total sales volume. However, in 1961 in that market area Utah Pie sold no 'Bel-air' frozen fruit pies to Safeway, while in that year Pet, sold Safeway 14.897.5 dozen frozen fruit pies, and Pet's market share or percentage of total sales volume, with the frozen fruit pies sold by it to Safeway excluded, was 22.9 per cent.
 
 
 200
 Pet's market share, exclusive of 'Bel-air' frozen fruit pies sold to Safeway, increased 7.3 per cent in 1961 over 1960, but uncontroverted facts show that gain did not result from a loss by Utah Pie. In 1960, Utah Pie sold 4,608.5 dozen 'Bel-air' mince pies to Safeway. Due to its unwillingness to use the new type carton Safeway requested it sold Safeway only 50 dozen mince pies in 1961. It is apparent that no problem with respect to new cartons existed as to pumpkin pies, because Utah Pie sold Safeway, 1,146.5 dozen more pumpkin pies in 1961 than it did in 1960. The only reasonable inferences is that had Utah Pie been willing to adopt the new carton for mince pies, it would have sold Safeway at least as many mince pies in 1961 as it did in 1960, and had it done so its market share in 1961 would have been 46.8 per cent, instead of 45.3 per cent. In 1960, Pet's 'Swiss Miss' sales accounted for 11.1 per cent of the total sales in the Salt Lake City market area, while its 'Pet-Ritz' sales accounted for only 4.5 per cent thereof. In 1961, Pet's 'Swiss Miss' sales accounted for 21.2 per cent of the total sales in such market area, while its 'Pet-Ritz' sales accounted for only 1.7 per cent thereof. Pet's increase in market share in 1961 was due solely to the increase in its sales of 'Swiss Miss' pies, and that pie, on an ounce-for-ounce basis, was always sold at a higher price than Utah Pie's 'Frost 'N' Flame' pie. In only one month, May 1961, was 'Swiss Miss' sold at a higher price in San Francisco than in Salt Lake City.
 
 
 201
 Moreover, the market share percentage of sellers in the Salt Lake City market area, other than Utah Pie and the defendants, decreased 4.5 per cent and their sales volume decreased 4,902 dozen in 1961; and it is reasonable to infer that Pet's market share increase in 1961 derived from such decreases suffered by such other sellers. And in view of the fact that Utah Pie had a substantial sales volume increase in 1961 and would have had a market share percentage increase in that year, had its sales of 'Bel-air' frozen mince pies not substantially decreased, due to its refusal to adopt a new carton, it would be unreasonable to infer that Pet's gain resulted from any sales loss by Utah Pie.
 
 
 202
 The total sales volume in dozens and the percentage of market share of Utah Pie and Pet in the Salt Lake City market area, with the 'Bel-air' sales by Pet excluded, in the years 1958 to 1961, inclusive, were as follows:
 
 
 203
 Volume of Sales Market Share
 ------------------- --------------
 Pet Utah Pie Pet Utah Pie
 -------- --------- ---- --------
1958 9,336.5 37,969.5 16.4 66.5
1959 14,176.5 38,372 12.7 34.3
1960 28,786 83,894 15.6 45.5
1961 51,888.5 102,690 22.9 45.3
 
 
 204
 In 1962, Utah Pie's volume increased to 129,658.3. Pet's volume and its and Utah Pie's market share percentages are not shown in the record.
 
 
 205
 Even if 'Bel-air' sales by Pet be included in its volume, Utah Pie greatly outdistanced Pet in 1960 and 1961.
 
 
 206
 We have shown that the jury's verdict against Pet was based on parts (A) and (G) of Exhibit 95 and the exhibits from which it was derived; that at the beginning of 1960, Associated Grocers, the largest purchaser of frozen pies and Utah Pie's largest customer in the Salt Lake City market area, which theretofore had purchased large quantities of Utah Pie's 'Utah' brand of frozen pies, virtually discontinued handling and advertising 'Utah' brand frozen pies and thereafter, through 1960 and 1961, purchased almost exclusively Utah Pie's controlled brand 'Frost 'N' Flame' frozen pies in increasingly large quantities; and that the accountant who prepared such exhibits in making his computations wholly disregarded the sales of 'Frost 'N' Flame' frozen pies by Utah Pie to Associated Grocers. It is obvious from those facts and other facts hereinbefore set out that parts (A) and (G) of Exhibit 95 and the exhibits on which such parts were based presented a clearly erroneous factual foundation for the computation of damages, and that their admission was plain and prejudicial error.
 
 
 207
 It follows that the judgment against Pet must be reversed and the cause remanded for a new trial on the 2(a) claims against Pet.
 
 IV
 No. 7308-- The Carnation Appeal
 
 208
 Carnation entered the frozen pie business in 1955 by acquiring a Los Angeles company then engaged in manufacturing and selling frozen pies in Utah and elsewhere under the 'Simple Simon' brand. Carnation made substantial improvements in its predecessor's plant at Torrance, California, (near Los Angeles) and radically altered its distribution system. At all times here material, Carnation marketed its 'Simple Simon' pies in all western market areas, that is, Los Angeles, San Francisco, Portland, Boise, Seattle, Spokane, Phoenix, Salt Lake City, and Denver. Shortly after Carnation entered the field, the frozen pie business became highly competitive, marked by the introduction into the market areas of national brands, such as Pet's 'Pet-Ritz,' Continental's 'Morton,' and a number of other national brands. Also, in some of such market areas there were brands of regional manufacturers, such as 'Mary Elizabeth,' 'County Fair,' 'Frigid Dough,' 'Chet's,' and others, and also brands of local manufacturers, such as Utah Pie.
 
 
 209
 In order to meet the competitive activities of other manufacturers in the various market areas in which it sold its pies, Carnation developed a program of special temporary price reductions, varying from market area to market area, and depending on local competitive conditions. These programs were called 'deals' in the trade. In some areas they took the form of advertising allowances. However, in Utah such allowances were not permitted to be considered in computing 'cost' under the Utah 'cost plus six per cent' minimum markup law (13-5-7 Utah Code Anno.1953). Carnation accordingly adopted 'off invoice' deals in Utah and other market areas where similar statutes were in effect. Both types of deals had the same competitive purpose, namely, to induce the retailer to purchase and advertise Carnation pies and thereby meet the competitive tactics of other manufacturers having a like aim. All deals had common characteristics. They were of a temporary nature and they were offered to all purchasers alike in each market area.
 
 
 210
 Since deals were directed at local competitive conditions, they differed in duration, type, and amount in each market area, so that Carnation's net prices in each of the national market areas also frequently differed. At times during the period 1958 to 1961, inclusive, Carnation's prices in the Salt Lake City market area were higher than those charged in the Los Angeles area and at times they were lower. There was no relationship between the prices in the two areas. The price in each was determined by local competitive conditions.
 
 
 211
 In addition to Utah Pie's lower price structure, other competitive conditions in the period 1958 to 1961 affected the market price and the market for 'Simple Simon' pies in the Salt Lake City market area. In 1958, Safeway introduced a private brand, 'Bel-air,' manufactured by Pet. Though of a similar grade and quality, it was sold at a lower price than the 'Simple Simon' pie. In late 1959, Utah Pie introduced a controlled brand, 'Frost 'N' Flame,' for amrketing through Associated Grocers, the largest group of cooperative buyers in that market area. In 1961, it introduced another controlled brand, 'Mayfresh,' for marketing through Grand Central-American in that market area. The effect of a controlled brand, or label, is to tie the purchaser to a single supplier. Such was the effect here on Associated Grocers and Grand Central-American.
 
 
 212
 'Frost 'N' Flame' and 'Mayfresh' pies were of similar quality with 'Simple Simon' and other brands sold in the Salt Lake City market area, but were introduced and sold at prices considerably below Carnation's prices for 'Simple Simon' pies, as well as Utah Pie's own 'Utah' brand. Utah Pie's 'Utah' brand and its 'Frost 'N' Flame' and 'Mayfresh' brands were conceded to be identical pies with different labels.
 
 
 213
 Utah Pie's sales to Associated Grocers increased from 18,621 cases in 1959 to 77,894 cases in 1960, and 102,834 cases in 1961, while sales in the entire Salt Lake City market area only doubled in size between 1959 and 1961.
 
 
 214
 The three largest buyers of frozen pies in the Salt Lake City market area, whose advertising set the Salt Lake City market area prices, were Associated Grocers, Safeway, and Utah Wholesale Grocery. In 1961, Utah Pie sold to Associated Grocers nearly nine times as many pies as did Carnation, while in 1958, Utah Pie sold to Associated Grocers only three and one-half times as many pies as did Carnation. By the end of 1961, Carnation was entirely out at Safeway, the year in which Utah Pie sold Safeway 36,202 dozen frozen pies, including 6,533 dozen 'Bel-air' mince and pumpkin pies and 11,568 dozen pies under Utah Pie's own brand, 'Utah.' In 1958, Carnation sold four times as many pies as Utah Pie to Utah Wholesale Grocery, but in 1961, Utah Pie sold six and one-third times as many pies as did Carnation to Utah Wholesale Grocery. During the fouryear period, Utah Pie's sales to the 'big three' were over 240,000 dozen, while Carnation's were less than 30,000 dozen.
 
 
 215
 To make the comparison between Carnation and Utah Pie more graphic, we set forth in subjoined note[19] in parallel vertical columns the percentage of the market share in the Salt Lake City market area; and in like columns the volume of sales in dozens by Carnation and Utah Pie in each of the years 1958 to 1962, inclusive.
 
 
 216
 Frozen apple pie is the volume leader and price indicator. The frozen apple pie sales in the Salt Lake City market area from 1957 to 1961, inclusive, of Utah Pie and Carnation, and of Carnation in 1962, were as follows:
 
 
 217
 1957 1958 1959 1960 1961 1962
 -------- ------ ------ --------- -------- -------
 ( 4 mo.)
Utah Pie 893.5 10,312 13,285 27,225 46,791.5
 1957 1958 1959 1960 1961 1962
 -------- ------ ------ --------- -------- -------
 (12 mo.)
Carnation 3,234.5 2,391 3,164 8,455.5 6,885.5 1,802.5
 
 
 218
 Another basis of comparison is retailer's advertising. In 1961, retailers advertised Utah Pie's brands 72 times and Carnation's only four times.
 
 
 219
 A chart annexed to our former opinion as Appendix VII (see 349 F.2d 164, 165) sets forth month by month in the first, second, third, and fifth columns of figures the lowest absolute prices at which Carnation offered its frozen apple pies to dealers in the San Francisco, Spokane, Denver, and Salt Lake City market areas, and in the fourth column the lowest absolute price at which Utah Pie sold its 'Utah' brand frozen apple pies in the Salt Lake City market area. By 'absolute price' we mean the list price, less any deals offered, whether direct discounts from invoices or allowances for advertising. This chart covered the period from January 1958 to August 1961.
 
 
 220
 An examination of such chart shows that Carnation's absolute price for apple pie was uniform in the Spokane, Denver, and Salt Lake City market areas from January 1958 through October 1959; that during that period Carnation's price in the Salt Lake City market area was always the same as or higher than its price in the fourth market area, San Francisco; and that during such time the only variations in Carnation's prices were in the San Francisco market area, with such variations making the price in that market area lower than its price in the other market areas from time to time.
 
 
 221
 The chart further shows that in February 1960 Carnation's Salt Lake City market price was lower than its San Francisco market price, and in March, April, May, October, November, and December, price was lower than its Spokane market price, but that at no time during 1960 price, but that at no time during 1960 was the Salt Lake City market price the lowest price offered by Carnation in the several market areas.
 
 
 222
 The chart further shows that from January 1961 to July 1961 Carnation's Salt Lake City market price was lower than its San Francisco and Spokane market prices, and that in August 1961 its Salt Lake City market price was lower than its Spokane and Denver market prices, but in 1961 Carnation's Salt Lake City market price was never the lowest price offered by Carnation in the several market areas.
 
 
 223
 The chart further shows that in only eight months of the 44 months here involved was Carnation's market price for its 'Simple Simon' pie lower than Utah Pie's price for its 'Utah' brand pie in the Salt Lake City market area, the months being October, November, and December 1958, July 1959, February and March 1960, and February and April 1961.
 
 
 224
 Utah Pie's price for its 'Frost 'N' Flame' pie, from the time it was first introduced in August 1959 through 1961, was always lower than Carnation's price for its 'Simple Simon' pie in the Salt Lake City market area. A chart annexed to our former opinion as Appendix VIII (see 349 F.2d 165) sets forth Utah Pie's sale prices for its 'Frost 'N' Flame' apple pie and Carnation's offering prices for its 'Simple Simon' apple pie from August 1959 to August 1961, inclusive, in the Salt Lake City market area. It will be noted therefrom that the prices for the 'Simple Simon' apple pie were always substantially higher than the prices for the 'Frost 'N' Flame' apple pie during that period.
 
 
 225
 Appendices VII and VIII, annexed to our former opinion (see 349 F.2d 164, 165), show that Carnation's prices for its 'Simple Simon' pie from August 1959 to August 1961, inclusive, were always higher in the four market areas covered in Appendix VII, of which the Salt Lake City market area is one, than Utah Pie's prices for its 'Frost 'N' Flame' pie in the Salt Lake City market area in that period, except in Denver in October 1960, and January, February, March, April, and May, 1961.
 
 
 226
 Carnation's prices for other pies, through its deal offers in the Salt Lake City market area, were at times below and at times above Utah Pie's price for its 'Utah' brand.
 
 
 227
 It should be noted that 1958, the year in which during the months of October, November, and December Carnation's price for its 'Simple Simon' pie was lower than Utah Pie's price for its 'Utah' brand in the Salt Lake City market area, was the year in which Utah Pie's market share of all the pies sold in such market area zoomed to 66.5 per cent. And further, that in 1959, when Utah Pie's market share fell to 34.3 per cent, Utah Pie's prices for its 'Utah' brand, except in the month of July of that year, were always lower than Carnation's prices for its 'Simiple Simon' pie in the Salt Lake City market area. And further, that in 1960, when Utah Pie's prices for its 'Utah' brand were lower, except for two months, February and March, than Carnation's prices for its 'Simple Simon' pie, and when Carnation's prices were always higher than Utah Pie's prices for its 'Frost 'N' Flame' pie in the Salt Lake City market area, Utah Pie's market share increased 11.2 per cent over the previous year and its volume more than doubled, being a 45,522 dozen increase over the previous year, while Carnation's market share increased only 3.5 per cent and its volume only 12,746.5 dozen. And finally, that in 1961, when Utah Pie's prices for its 'Utah' brand were lower, except in two months, February and April, than Carnation's prices for its 'Simple Simon' pie, and when Carnation's prices were always higher than Utah Pie's for its 'Frost 'N' Flame' pie in the Salt Lake City market area, Utah Pie's market share decreased two tenths of one per cent and its volume increased 18,796 dozen over the previous year, and Carnation's market share decreased 3.3 per cent and its volume decreased 2,304.5 dozen from the previous year.
 
 
 228
 The market shares, respectively, of Utah Pie, Carnation, and all the other sellers in the Salt Lake City market area in the years 1958 to 1961, inclusive, were as follows:
 
 
 229
 1958 1959 1960 1961
 ----- ----- ----- -----
Utah Pie 66.5% 34.3% 45.5% 45.3%
Carnation 10.3% 8.6% 12.1% 8.8%
All other
 sellers 23.2% 57.1% 42.4% 45.9%
 
 
 230
 What Utah Pie lost in 1959 went not to Carnation, but to other sellers in that market area, as did Carnation's market share loss in that year.
 
 
 231
 The market share of both Carnation and Utah Pie increased in 1960, but it is clear that those gains resulted from loss of market share by sellers other than Utah Pie and Carnation. In 1961, Carnation's share dropped back to approximately where it was in 1959, Utah Pie remained at approximately its 1960 percentage share, and other sellers gained slightly more than Carnation lost.
 
 
 232
 Carnation's reduction of prices in the Salt Lake City market area was made in an effort that was far from successful to compete with the prices at which Utah Pie offered and sold its pies. Clearly, Carnation was never able to compete with Utah Pie's 'Frost 'N' Flame' pie price, and only part of the time with the price at which Utah Pie priced and sold its 'Utah' brand pies.
 
 
 233
 However, in view of the Supreme Court's decision in these cases, we must assume that under the evidence the jury was warranted in finding that Carnation had violated 2(a). That being so, we do not think it can be said as a matter of law that Utah Pie suffered no damages proximately caused by such violations.
 
 
 234
 We have shown that the jury's verdict against Carnation was based on parts (A) and (G) of Exhibit 95 and the exhibits from which it was derived. For substantially the same reasons we stated, supra, that such parts (A) and (G) of Exhibit 95 and the exhibits upon which they were based presented a clearly erroneous foundation for the computation of damages against Pet, we also conclude they presented a clearly erroneous foundation for the computation of damages against Carnation, and that their admission against Carnation was plain and prejudicial error. It follows that the judgment against Carnation must be reversed and the case remanded for a new trial on the 2(a) claims against Carnation.
 
 
 235
 The consolidated judgment and the injunctive decree are severally reversed and the case is remanded, with instructions to grant new trials to Continental, Pet, and Carnation, and Utah Pie a new trial on Continental's counterclaim, and proceed further in accordance with the views expressed in the opinion of the Supreme Court and in this opinion.
 
 Pl. 's Ex. 62
 
 236
 page 1
 
 
 237
 APPENDIX A
 MARKET SHARES OF 8" FROZEN FRUIT PIE-INTERMOUNTAIN MARKET-1958
 Number of Dozens by Flavor
-------------------------------------------------------------------------------
Brand Apple Cherry Peach Boysenberry Mince Pumpkin Other All
 Fruit Flavors
-------------------------------------------------------------------------------
1 Carnation 2391.0 1353.5 105.5 856.5 340.0 425.0 391.5 5863.0
-------------------------------------------------------------------------------
2 Mortons 249.0 83.5 25.5 63.5 127.5 201.0 4.0 754.0
-------------------------------------------------------------------------------
3 Utah Pie 10312.0 9513.5 -- 8792.0 2666.0 6675.0 11.0 37969.5
6 BelAir-Utah -- -- -- -- -- -- -- --
 Pie
Total 3 k 6 10312.0 9513.5 -- 8792.0 2666.0 6675.0 11.0 37969.5
4 Frost N'Flame -- -- -- -- -- -- -- --
5 Mayfresh -- -- -- -- -- -- -- --
Total Utah Pie 10312.0 9513.5 -- 8792.0 2666.0 6675.0 11.0 37969.5
-------------------------------------------------------------------------------
8 Swiss Miss -- -- -- -- -- -- -- --
7 Pet Ritz 3269.0 2676.5 781.0 1041.0 598.5 779.0 191.5 9336.5
6 BelAir-Pet -- -- -- -- -- -- -- --
 Milk
Total 7 k 6 3269.0 2676.5 781.0 1041.0 598.5 779.0 191.5 9336.5
Total Pet Milk 3269.0 2676.5 781.0 1041.0 598.5 779.0 191.5 9336.5
-------------------------------------------------------------------------------
Total Other 1427.0 1326.0 195.5 130.5 31.0 2.0 25.0 3137.0
-------------------------------------------------------------------------------
Total All 17648.0 14953.0 1107.5 10883.5 3763.0 8082.0 623.0 57060.0
 Brands
-------------------------------------------------------------------------------
 Corrected & Verified 12/11/62
 Pl. 's Ex. 62
 page 2
 APPENDIX A
 ----------
 MARKET SHARES OF 8" FROZEN FRUIT PIE-INTERMOUNTAIN MARKET-1959
 Number of Dozens by Flavor
-------------------------------------------------------------------------------
Brand Apple Cherry Peach Boysenberry Mince Pumpkin Other All
 Fruit Flavors
-------------------------------------------------------------------------------
1 Carnation 3164.0 2147.5 852.0 995.5 1064.0 1198.0 204.0 9625.0
-------------------------------------------------------------------------------
2 Mortons 1907.5 1269.5 2.0 1.5 -- -- 1.5 3182.0
-------------------------------------------------------------------------------
3 Utah Pie 13264.0 7445.0 -- 7548.5 3002.0 6570.0 508.5 38338.0
6 BelAir-Utah -- -- -- -- -- -- -- --
 Pie
Total 3 k 6 13264.0 7445.0 -- 7548.5 3002.0 6570.0 508.5 38338.0
4 Frost 21.0 -- -- -- -- 13.0 -- 34.0
 N'Flame
5 Mayfresh -- -- -- -- -- -- -- --
Total Utah 13285.0 7445.0 -- 7548.5 3002.0 6583.0 508.5 38372.0
Pie
-------------------------------------------------------------------------------
8 Swiss Miss -- -- -- -- -- -- -- --
7 Pet Ritz 4933.0 3579.0 1481.5 1472.0 907.0 1146.0 658.0 14176.5
6 BelAir-Pet 9725.0 7425.0 4362.5 3950.0 -- -- -- 25462.5
 Milk
Total 7 k 6 14658.0 11004.0 5844.0 5422.0 907.0 1146.0 658.0 39639.0
Total Pet 14658.0 11004.0 5844.0 5422.0 907.0 1146.0 658.0 39639.0
Milk
-------------------------------------------------------------------------------
Total Other 8007.0 3036.5 1141.5 2822.0 2507.5 3358.5 38.0 20911.0
-------------------------------------------------------------------------------
Total All 41021.5 24902.5 7839.5 16789.5 7480.5 12285.5 1410.0 111729.0
Brands
-------------------------------------------------------------------------------
 Corrected & Verified 12/11/62
 
 
 238
 Pl.'s Ex. 62
 page 3
 APPENDIX A
 ----------
 MARKET SHARES OF 8" FROZEN FRUIT PIE-INTERMOUNTAIN MARKET-1960
 Number of Dozens by Flavor
-------------------------------------------------------------------------------
Brand Apple Cherry Peach Boysenberry Mince Pumpkin Other All
 Flavo-
 rs
-------------------------------------------------------------------------------
1 Carnation 8455.5 6788.0 2983.5 1586.5 962.5 1199.0 396.5 2237-
 1.5
-------------------------------------------------------------------------------
2 Mortons * 1950.0 100.0 -- -- 525.0 775.0 -- 3350-
 .0
-------------------------------------------------------------------------------
3 Utah Pie 12144.0 8595.5 592.5 7604.0 3404.0 4181.5 238.0 3675-
 9.5
6 BelAir-Utah -- -- -- -- 4608.5 5336.5 -- 9945-
 .0
Pie
Total 3 k 6 12144.0 8595.5 592.5 7604.0 8012.5 9518.0 238.0 4670-
 4.5
4 Frost 15081.0 5753.5 546.5 5569.0 3765.5 6474.0 -- 3718-
 9.5
N'Flame
5 Mayfresh -- -- -- -- -- -- -- --
Total Utah 27225.0 14349.0 1139.0 13173.0 11778.0 15992.0 238.0 8389-
 4.0
Pie
-------------------------------------------------------------------------------
8 Swiss Miss 63?7.0 5645.0 2988.5 5005.5 184.5 372.5 -- 2057-
 3.0
7 Pet Ritz 3105 2344.0 1208.0 612.5 135.0 220.0 588.5 8213-
 .0
6 BelAir-Pet 14015.0 4927.5 1602.5 2149.0 -- -- -- 2269-
 4.0
Milk
Total 7 k 6 17120.0 7271.5 2810.5 2761.5 135.0 220.0 588.5 3090-
 7.0
Total Pet 23497.0 12916.5 5799.0 7767.0 319.5 592.5 588.5 5148-
 0.0
Milk
-------------------------------------------------------------------------------
Total Other 8566.0 5829.5 1638.0 4734.0 698.0 1705.0 303.0 2347-
 3.5
-------------------------------------------------------------------------------
Total All 70293.5 39983.0 11559.5 27260.5 14283.0 20263.5 1526.0 18304-
 3.0
Brands
-------------------------------------------------------------------------------
* Corrected 2-2-63, on basis of additional sales of A. G. (Pocatello), Idaho
Creameriies, Idaho Falls, and Cannery Sales, Salt Lake City, reported by
Continenntal this date.
 Pl.'s Ex. 62
 page 4
 APPENDIX A
 ----------
 MARKET SHARES OF 8" FROZEN FRUIT PIE-INTERMOUNTAIN MARKET-1961
 Number of Dozens by Flavor
-------------------------------------------------------------------------------
Brand Apple Cherry Peach Boysenberry Mince Pumpkin Other All
 Fruit Flavors
-------------------------------------------------------------------------------
1 Carnation 6885.5 5355.5 1821.0 2411.0 716.5 942.0 1935.5 20067-
 .0
-------------------------------------------------------------------------------
2 Mortons 14699.5 1337.5 12.5 1287.5 250.0 1212.5 -- 18799-
 .5
-------------------------------------------------------------------------------
3 Utah Pie 20403.0 7392.5 1644.0 6378.5 6902.5 3145.5 150.0 46016-
 .0
6 BelAir-Utah -- -- -- -- 50.0 6483.0 -- 6533-
 .0
 Pie
Total 3 k 6 20403.0 7392.5 1644.0 6378.5 6952.5 9628.5 150.0 52549-
 .0
4 Frost 25930.5 6710.0 2023.0 5663.5 3583.0 5053.5 -- 48963-
 .5
 N'Flame
5 Mayfresh 458.0 347.5 50.0 322.0 -- -- -- 1177-
 .5
Total Utah 46791.5 14450.0 3717.0 12364.0 10535.5 14682.0 150.0 102690-
 .0
Pie
-------------------------------------------------------------------------------
8 Swiss Miss 16272.0 13387.0 2310.0 14748.0 505.0 860.0 22.0 48104-
 .0
7 Pet Ritz 1497.0 792.5 325.0 552.5 12.5 15.0 590.0 3784.5
6 BelAir-Pet 8732.5 4115.0 500.0 550.0 1000.0 -- -- 14897-
 .5
 Milk
Total 7 k 6 10229.5 4907.5 825.0 1102.5 1012.5 15.0 590.0 18682-
 .0
Total Pet 26501.5 18294.5 3135.0 15850.5 1517.5 875.0 612.0 66786-
 .0
Milk
-------------------------------------------------------------------------------
Total Other 5024.0 3500.5 1053.0 3250.0 1946.0 3344.5 447.5 18565-
 .5
-------------------------------------------------------------------------------
Total All 99902.0 42938.0 9738.5 35163.0 14965.5 21056.0 3145.0 226908-
 .0
Brands
-------------------------------------------------------------------------------
 Corrected & Verified 12/11/62
 
 
 239
 Pl.'s Ex. 94
 UTAH PIE COMPANY
 Estimated Dozens Lost to Defendants
 Years 1958, 1960 & 8-month Period Ended 8/31/61
 Dozens Lost Total
 ------------ ------------
Morton
 Denver Sales
 1959 52,000
 1960 74,500
 1961 (To 8/31/61) 105,000 231,500
Pet
 Salt Lake Div. - Bel Air
 1959 25,462
 1960 22,694
 1961 (To 8/31/61) 9,932 58,088
 Denver - Bel Air
 1959 40,000
 1960 30,000
 1961 (To 8/31/61) 20,000 90,000
All Defendants
 Intermountain Area per Ex. 62
 1959 9,411
 1960 34,218
 1961 (To 8/31/61) 34,350 77,979
 Seattle, Spokane, Portland Area
 1959 5,000
 1960 8,000
 1961 (To 8/31/61) 10,000 23,000
 Total Dozens 480,567
 DOZENS OF FROZEN FRUIT PIES SOLD BY DEFENDANTS AND
 --------------------------------------------------
 PLAINTIFF IN THE INTERMOUNTAIN MARKET FOR THE YEARS
 ---------------------------------------------------
 1958, 1959, 1960, AND 1961 (OTHER THAN PRIVATE LABEL BRANDS) *
 --------------------------------------------------------------
 1958 Percent to 1959
 ---- ---------- ----
 Company and Brand (Dozens) Total (Dozens)
 ----------------- -------- ----- --------
Carnation Company (Simple 5,863.0 10.87% 9,625.0
 Simon)
Continental Baking Company 754.0 1.40% 3,182.0
 (Morton)
Pet Milk Company (Pet-Ritz 9,336.5 17.32% 14,176.5
 and Swiss Miss)
Utah Pie Company (Utah) 37,969.5 70.41% 38,338.0
 -------- ------- --------
Totals 53,923.0 100.00% 65,321.5
------ -------- ------- --------
 TABLE CONTINUED
Percent to 1960 Percent to 1961 Percent to
---------- ---- ---------- ---- ----------
 Total (Dozens) Total (Dozens) Total
 ----- -------- ----- -------- -----
 14.74% 22,371.5 24.51% 20,067.0 14.67%
 4.87% 3,350.0 3.67% 18,799.5 13.75%
 21.70% 28,786.0 31.54% 51,888.5 37.94%
 58.69% 36,759.5 40.28% 46,016.0 33.64%
 ------- -------- ------- --------- -------
 100.00% 91,267.0 100.00% 136,771.0 100.00%
 ------- -------- ------- --------- -------
 PERCENTAGE CHANGE USING 1958 AS BASE YEAR
 -----------------------------------------
 Continental
 -----------
 Carnation Baking Pet Milk Utah Pie
 --------- ----------- -------- --------
 Year Company Company Company Company
 ---- ------- ------- ------- -------
1958 (Base Year) 10.87% 1.40% 17.32% 70.41%
 ------ ----- ------ ------
1959 Increase (Decrease) 3.87% 3.47% 4.38% (11.72%)
1960 Increase (Decrease) 13.64% 2.27% 14.22% (30.13%)
1961 Increase (Decrease) 3.80% 12.35% 20.62% (36.77%)
 
 
 240
 COMPUTATION OF ADDITIONAL DOZENS UTAH PIE COMPANY
 -------------------------------------------------
 WOULD HAVE SOLD IF 1958 MARKET POSITION IN RELATION TO
 ------------------------------------------------------
 DEFENDANTS WERE MAINTAINED FOR YEARS 1959, 1960 and 1961
 --------------------------------------------------------
 Jan. 1,
 1961 to
 -------
 Aug. 31,
 1959 1960 1961
 ---- ---- --------
(1) Percent of total sales in
 Intermountain Market by
 defendants and plaintiffs
 (other than private label) 58.69% 40.28% 33.64%
(2) Actual dozens of Utah Brand
 sold by Utah Pie Comapny
 per IBM run 47,127.0 45,744.5 31,425.5
(3) Actual dozens divided by
 Percentage in (1) above to
 obtain 100% 80,298.0 113,566 93,417.0
(4) 1958 base year percentage for
 Utah Pie Company 70.41% 70.41% 70.41%
(5) Total dozens Utah Pie Company
 would have sold if 1958
 market position in relation
 to defendants were maintained 56,538 79,962 65,775
(6) Additional dozens Utah Pie
 Company would have sold
 if 1958 market position in
 relation to defendants were
 maintained 9,411 34,218 34,350
 ----- ------ ------
 SUMMARY OF ADDITIONAL DOZENS IN (6) BY DEFENDANT
 ------------------------------------------------
 BASED UPON THE PERCENTAGE CHANGE OF EACH IN RELATION
 ----------------------------------------------------
 TO PLAINTIFF
 ------------
 1959 1960 1961 period Totals
 ---- ---- ----------- ------
Carnation Company 3,108 15,490 3,549 22,147
Continental Baking Company 2,787 2,578 11,538 16,903
Pet Milk Company 3,516 16,150 19,263 38,929
 ----- ------ ------ ------
Total as Above 9,411 34,218 34,350 77,979
 ----- ------ ------ ------
 UTAH PIE COMPANY
 ----------------
 COMPUTATION OF ESTIMATED GROSS PROFIT ON ADDITIONAL DOZENS
 ----------------------------------------------------------
 UTAH PIE COMPANY WOULD HAVE SOLD IF 1958 MARKET
 -----------------------------------------------
 POSITION IN RELATION TO DEFENDANTS HAD BEEN MAINTAINED
 ------------------------------------------------------
 Jan. 1, 1961
 -------
 to Aug. 31,
 -------
 1959 1960 1961 Totals
 ---- ---- ---- ------
Continental Baking Company
--------------------------
Additional Dozens 2,787 2,578 11,538 16,903
Sales Price:
 Based on per dozen prices of:
 $4.30 $11,984 $11,085 $49,613 $72,682
 $4.10 11,427 10,570 47,306 69,303
 $3.90 10,869 10,054 44,998 65,921
 $3.70 10,312 9,539 42,691 62,542
Cost of Sales * 7,804 7,322 32,422 47,548
Gross Profit:
 Based on per dozen sales price of:
 $4.30 $4,180 $3,763 $17,191 $25,134
 $4.10 3,623 3,248 14,884 21,755
 $3.90 3,065 2,732 12,576 18,373
 $3.70 2,508 2,217 10,269 14,994
* Based on Utah Pie Company's 1960 price determination and weighted for
 flavor mix in each year.
 UTAH PIE COMPANY
 ----------------
 COMPUTATION OF ESTIMATED GROSS PROFIT ON ADDITIONAL DOZENS
 ----------------------------------------------------------
 UTAH PIE COMPANY WOULD HAVE SOLD IF 1958 MARKET
 -----------------------------------------------
 POSITION IN RELATION TO DEFENDANTS HAD BEEN MAINTAINED
 ------------------------------------------------------
 Jan. 1, 1961
 ------------
 to Aug. 31,
 ------------
 1959 1960 1961 Totals
 ---- ---- ---- ------
Carnation Company
-----------------
 Additional Dozens 3,108 15,490 3,549 22,147
 Sales Price:
 Based on per dozen price of:
 $4.30 $13,364 $66,607 $15,261 $95,232
 $4.10 12,743 63,509 14,551 90,803
 $3.90 12,121 60,411 13,841 86,373
 $3.70 11,500 57,313 13,131 81,944
 Cost of Sales * 8,702 43,992 9,973 62,667
 Gross Profit:
 Based on per dozen sales price of:
 $4.30 $ 4,662 $22,615 $ 5,288 $32,565
 $4.10 4,041 19,517 4,578 28,136
 $3.90 3,419 16,419 3,868 23,706
 $3.70 2,798 13,321 3,158 19,277
* Based on Utah Pie Company's 1960 price determination and weighted for
flavor mix in each year.
 UTAH PIE COMPANY
 ----------------
 COMPUTATION OF ESTIMATED GROSS PROFIT ON ADDITIONAL DOZENS
 ----------------------------------------------------------
 UTAH PIE COMPANY WOULD HAVE SOLD IF 1958 MARKET
 -----------------------------------------------
 POSITION IN RELATION TO DEFENDANTS HAD BEEN MAINTAINED
 ------------------------------------------------------
 Jan. 1, 1961
 ------------
 to August
 31,
 ------------
 1959 1960 1961 Totals
 ---- ---- ---- ------
Pet Milk Company
----------------
 Additional Dozens 3,516 16,150 19,263 38,929
 Sales Price:
 Based on per dozen price of:
 $4.30 $15,119 $69,445 $82,831 $167,395
 $4.10 14,416 66,215 78,978 159,609
 $3.90 13,712 62,985 75,126 151,823
 $3.70 13,009 59,755 71,273 144,037
 Cost of Sales * 9,845 45,866 54,129 109,840
 Gross Profit:
 Based on per dozen sales price of:
 $4.30 $ 5,274 $23,579 $28,702 $57,555
 $4.10 4,571 20,349 24,849 49,769
 $3.90 3,867 17,119 20,997 41,983
 $3.70 3,164 13,889 17,144 34,197
* Based on Utah Pie Company's 1960 price determination and weighted for
 flavor mix in each year.
 COMPUTATION OF ESTIMATED GROSS PROFIT UTAH PIE COMPANY
 ------------------------------------------------------
 WOULD HAVE REALIZED IF AN ADDITIONAL 23,000 DOZEN
 -------------------------------------------------
 FROZEN FRUIT PIES HAD BEEN SOLD IN THE
 --------------------------------------
 SEATTLE, SPOKANE, AND PORTLAND AREAS
 ------------------------------------
 Jan. 1, 1961
 ------------
 to Aug. 31,
 ------------
 1959 1960 1961 Totals
 ---- ---- ---- ------
Additional Dozens 5,000 8,000 10,000 23,000
Sales Price:
 Based on per dozen prices of:
 $4.30 $21,500 $34,400 $43,000 $98,900
 $4.10 20,500 32,800 41,000 94,300
 $3.90 19,500 31,200 39,000 89,700
 $3.70 18,500 29,600 37,000 85,100
Cost of Sales: 15,500 25,120 31,100 71,720
Gross Profit:
 Based on per dozen sales price of:
 $4.30 $ 6,000 $9,280 $11,900 $27,180
 $4.10 5,000 7,680 9,900 22,580
 $3.90 4,000 6,080 7,900 17,980
 $3.70 3,000 4,480 5,900 13,380
 
 
 241
 DISTRIBUTION TO DEFENDANTS
 --------------------------
 (40%) (40%) (20%)
 Continental
 ---------------------
 Carnation Baking Pet Milk
 --------- ------ --------
 Company Company Company
 ------- ------- -------
 $10,872 $10,872 $ 5,436
 9,032 9,032 4,516
 7,192 7,192 3,596
 5,352 5,352 2,676
* 30 cents per dozen freight added to costs of manufacturing.
 COMPUTATION OF ESTIMATED GROSS PROFIT ON 231,500 DOZEN FROZEN FRUIT PIES
 ------------------------------------------------------------------------
 IF THIS AMOUNT HAD BEEN SOLD BY UTAH PIE COMPANY
 ------------------------------------------------
 IN THE DENVER, COLORADO AREA
 ----------------------------
 Jan. 1, 1961
 ------------
 to Aug. 31,
 ------------
 1959 1960 1961 Totals
 ---- ---- ---- ------
Continental Baking Company
--------------------------
 Additional Dozens 52,000 74,500 105,000 231,500
 Sale Price:
 Based on per dozen prices of:
 $4.30 $223,600 $320,350 $451,500 $995,450
 $4.10 213,200 305,450 430,500 949,150
 $3.90 202,800 290,550 409,500 902,850
 $3.70 192,400 275,650 388,500 856,550
 Cost of Sales * 156,000 226,480 316,050 698,530
 Gross Profit:
 Based on per dozen sales price of:
 $4.30 $67,600 $93,870 $135,450 $296,920
 $4.10 57,200 78,970 114,450 250,620
 $3.90 46,800 64,070 93,450 204,320
 $3.70 36,400 49,170 72,450 158,020
* 20 cents per dozen freight added to costs of manufacturing
 COMPUTATION OF ESTIMATED GROSS PROFIT UTAH PIE COMPANY
 ------------------------------------------------------
 WOULD HAVE REALIZED ON 58,083 AND 90,000 DOZEN FROZEN FRUIT PIES
 ----------------------------------------------------------------
 IF THESE RESPECTIVE AMOUNTS HAD BEEN SOLD TO THE SALT LAKE AND DENVER
 ---------------------------------------------------------------------
 DIVISIONS OF SAFEWAY STORES
 ---------------------------
 Salt Lake Safeway Division
 ---------------------------------------------
 Jan. 1,
 1961
 ------- Total
 to August -----
 31st Salt Lake
 --------- ---------
 1959 1960 1961 * Division
 ---- ---- ------ --------
Pet Milk Company
----------------
 Additional Dozens -
 Bel Air Brand (Safeway's) 25,462 22,694 9,932 58,088
 -------------------------
 Sales Price: ** Per Dozen
 ------------ ---------
 Apple @ $3.30 $32,092 $46,249 $19,211 $97,552
 Cherry @ 3.44 25,542 16,951 9,437 51,930
 Peach @ 3.56 15,530 5,705 1,107 22,422
 Boysenberry @ 3.56 14,062 7,650 1,305 23,017
 Mince @ 3.94 - - 2,627 2,627
 ---------- ---------- ---------- ---------
 Total $87,226 $76,555 $33,767 $197,348
 Cost of Sales: ***
 --------------
 Apple @ $2.64 $25,674 $37,000 $15,369 $78,043
 Cherry @ 3.05 22,646 15,029 8,367 46,042
 Peach @ 3.02 13,175 4,840 1,007 19,022
 Boysenberry @ 3.02 11,929 6,490 1,107 19,526
 Mince @ 2.92 - - 1,947 1,947
 ---------- ---------- ---------- ---------
 Total $73,424 $63,359 $27,797 $164,580
 ---------- ---------- ---------- ---------
 Gross Profit $13,802 $13,196 $ 5,970 $32,968
 ------------
 Add: Freight Advantage
 30 cents per dozen
 Salt Lake Division 7,639 6,808 2,980 17,427
 20 cents per dozen
 Denver Division
 ---------- ---------- ---------- ---------
 Gross Profit After
 Freight Advantage $21,441 $20,004 $ 8,950 $50,395
 
 
 242
 Denver Safeway Division
---------------------------------------------------------------------------
 Jan. 1, 1961 Total
 ------------ -----
 to August 31st Denver
 -------------- ------
 1959 1960 1961 Division
 ---- ---- ---- --------
 40,000 30,000 20,000 90,000
 $50,424 $61,083 $38,676 $150,183
 40,179 22,394 18,989 81,562
 24,350 7,583 2,421 34,354
 22,072 10,146 2,634 34,852
 - - 5,280 5,280
 -------- -------- ------- --------
 $137,025 $101,206 $68,000 $306,231
 $40,339 $48,866 $30,941 $120,146
 35,624 19,855 16,836 72,315
 20,657 6,433 2,054 29,144
 18,724 8,607 2,235 29,566
 - - 3,913 3,913
 -------- ------- ------- --------
 $115,344 $83,761 $55,979 $255,084
 -------- ------- ------- --------
 $21,681 $17,445 $12,021 $51,147
 8,000 6,000 4,000 18,000
 ----- ----- ----- ------
 $29,681 $23,445 $16,021 $69,147
 ------- ------- ------- -------
* prorated by months for full year 1961.
** based on Safeway Contract prices.
*** based on actual prices determined by Utah Pie Company for 1960.
 UTAH PIE COMPANY
 ----------------
 COMPUTATION OF ADDITIONAL REVENUE UTAH PIE COMPANY WOULD HAVE
 -------------------------------------------------------------
 RECEIVED ON PRIVATE LABEL SALES IF PRICES HAD BEEN EQUIVALENT TO
 ----------------------------------------------------------------
 SAFEWAY CONTRACT PRICES
 -----------------------
 Apple Cherry
 -------------------------- ------------------------
 Dozens Net Sales Dozens Net Sales
 ------ --------- ------ ---------
1959
----
Frost N' Flame 225.0 $ 842.50 174.0 $ 680.65
1960
----
Frost N' Flame 13,968.0 42,345.91 6,532.5 21,782.37
Sonny Boy 4,159.0 12,219.00 2,746.5 8,998.79
Bel-Air
1961 (to 8/31/61)
-----------------
Frost N' Flame 21,455.5 61,738.41 5,331.0 18,316.97
Sonny Boy 2,382.5 7,385.75 1,500.0 5,025.00
Mayfresh 100.0 310.00 100.0 345.00
 -------- ----------- -------- ----------
 42,290.0 $124,841.57 16,384.0 $55,148.78
Price Per Dozen $3.30 $3.44
 ----- -----
Dozens Times Price 139,557.00 56,360.96
 ----------- ----------
Difference $14,715.43 $ 1,212.18
 ----------- ----------
 Boysenberry Blueberry Mince
-------------------- ----------------- --------------------
 Dozens Net Sales Dozens Net Sales Dozens Net Sales
-------- ---------- ------ --------- -------- ----------
 134.0 $ 517.95 3,713.0 $14,462.80
 6,094.0 19,861.78 233.5 $751.15 3,758.0 13,156.00
 3,207.0 9,940.54 1,935.0 6,387.75
 4,483.5 15,154.23
 4,097.0 13,837.30 50.0 165.00 308.5 1,048.90
 1,207.5 3,984.75
 100.0 340.00
-------- ---------- ------ --------- -------- ----------
14,839.5 $48,482.32 283.5 $916.15 14,198.0 $50,209.68
 $3.56 $4.28 $3.94
-------- ------ --------
 52,828.62 213.38 55,940.12
 ---------- --------- ----------
 $ 4,346.30 $297.23 $ 5,730.44
 
 
 243
 Pumpkin Peach Total
-------------------- -------------------- ----------------------
 Dozens Net Sales Dozens Net Sales Dozens Net Sales
-------- ---------- -------- ---------- --------- -----------
3,998.5 $14,791.45 8,244.5 $ 31,295.35
5,746.0 19,249.81 546.5 $1,830.79 36,878.5 118,977.81
2,461.0 7,539.30 648.5 2,094.66 15,157.0 47,180.04
5,211.5 16,676.80 9,695.0 31,831.03
 134.5 450.58 1,774.0 5,860.45 33,150.5 101,417.61
 525.0 1,695.75 5,615.0 18,091.25
 300.0 995.00
-------- ---------- -------- ---------- --------- -----------
17,551.5 $58,707.94 3,494.0 $11,481.65 109,040.5 $349,788.09
 $3.38 $3.56
-------- --------
 59,324.07 12,438.64 377,662.79
 ---------- ---------- -----------
 $ 616.13 $ 956.99 $ 27,874.70
 ---------- ---------- -----------
 DISTRIBUTION TO DEFENDANTS *
 ----------------------------
Carnation Company $ 7,916
Continental Baking Company 6,049
Pet Milk Company 13,910
 --------
Total $ 27,875
 --------
* Based on Market Share Study
 UTAH PIE COMPANY
 ----------------
 ADDITIONAL REVENUE UTAH PIE COMPANY WOULD HAVE
 ----------------------------------------------
 RECEIVED ON UTAH PIE BRAND SALES IF PRICES HAD
 ----------------------------------------------
 BEEN BASED ON AMOUNTS AS INDICATED
 ----------------------------------
 Jan. 1, 1961
 ------------
 to Aug. 31,
 ------------
 1959 1960 1961 Total
 ---------- ---------- ------------ ----------
Number of Dozens 47,127.0 45,744.5 31,534.0 124,405.5
Sales proceeds based on
 the following prices:
 $4.30 per dozen $202,646 $196,699 $135,596 $534,941
 4.10 per dozen 193,221 187,552 129,289 510,062
 3.90 per dozen 183,795 178,404 122,983 485,182
 3.70 per dozen 174,370 169,255 116,676 460,301
Net Sales proceeds
 actually received 184,111 164,177 107,289 455,577
Additional revenue based
 on following prices:
 $4.30 per dozen $ 18,535 $ 32,522 $ 28,307 $ 79,364
 4.10 per dozen 9,110 23,375 22,000 54,485
 3.90 per dozen none 14,227 15,694 29,921
 3.70 per dozen none 5,078 9,387 14,465
 DISTRIBUTION TO DEFENDANT *
 ---------------------------
 Continental
 -----------
 Carnation Baking Pet Milk
 --------- ----------- --------
 Company Company Company Total
 --------- ----------- -------- -------
$4.30 per dozen $22,539 $17,222 $39,603 $79,364
 4.10 per dozen 15,474 11,823 27,188 54,485
 3.90 per dozen 8,498 6,493 14,930 29,921
 3.70 per dozen 4,108 3,139 7,218 14,465
* Based on Market Study - Intermountain Area
APPENDIX B
LOWEST PET-RITZ APPLE PIE
SALE PRICES IN SEVEN MARKETS
 
 
 244
 (Prices are in Dozens)
 Salt Lake San Los
Date City Francisco Seattle Portland Angeles Denver Spokane
----- --------- --------- ------- -------- ------- ------ -------
1958
-----
May 5.16 4.72 4.96 5.00 4.58 4.96 5.16
June 5.00 4.68 5.00 5.00 4.58 4.92 5.16
July 5.00 4.68 5.00 5.00 4.58 4.96 5.16
Aug. 5.00 4.68 4.96 5.00 4.58 4.96 5.16
Sept. 5.00 4.68 5.00 5.00 4.58 4.96 5.16
Oct. 5.00 4.68 4.96 5.00 4.58 4.96 5.00
Nov. 5.00 4.56 4.80 4.84 4.58 4.96 4.84
Dec. 5.00 4.56 4.84 4.80 4.58 4.04 4.84
1959
-----
Jan. 4.44 4.04 4.36 4.44 3.90 4.36 4.44
Feb. 4.36 3.36 4.36 4.44 3.90 4.36 4.44
Mar. 4.44 4.00 4.36 4.44 3.90 4.36 4.36
Apr. 4.44 4.00 4.36 4.44 3.90 4.32 4.44
May 4.44 4.00 3.82 4.44 3.90 4.32 4.44
June 4.44 4.00 4.44 4.44 3.90 4.32 4.44
July 4.12 4.00 ---- * 4.64 3.94 4.00 4.04
Aug. 4.12 4.00 ---- 4.48 3.90 4.00 4.04
Sept. 4.12 4.00 ---- 4.48 3.90 4.00 4.04
Oct. 4.04 4.04 ---- 4.48 3.90 4.00 4.04
Nov. 4.12 4.00 ---- ---- 3.90 4.00 4.04
Dec. 3.84 4.00 ---- ---- 3.90 4.00 4.04
1960
-----
Jan. 4.12 4.00 4.12 ---- 3.90 4.00 4.12
Feb. 4.12 4.00 4.00 ---- 3.90 4.00 4.00
Mar. 4.04 4.00 ---- ---- 3.90 4.00 4.04
Apr. 4.04 4.00 4.04 ---- 3.90 4.00 4.12
May 4.12 4.00 4.12 ---- 3.90 4.00 4.12
June ---- 4.00 4.04 4.28 3.90 4.00 4.12
July 4.28 4.00 4.04 4.04 3.90 4.00 4.04
Aug. 4.28 4.40 4.48 4.40 4.26 4.00 4.48
Sept. 4.28 4.40 4.36 4.36 4.26 4.00 4.48
Oct. 4.64 4.36 4.36 4.40 4.26 4.00 4.48
Nov. 4.64 4.36 4.40 4.40 4.26 4.00 4.48
Dec. 4.64 4.40 4.00 4.48 4.26 4.00 4.08
1961
-----
Jan. 4.28 4.40 4.40 4.48 4.26 4.00 4.40
Feb. 4.28 4.40 4.36 4.40 4.26 4.00 4.40
Mar. 4.24 4.40 4.36 4.40 4.26 4.00 4.40
Apr. 4.08 4.48 4.36 4.40 4.26 4.00 4.40
May 4.48 4.40 4.40 4.48 4.26 3.84 4.40
June 4.64 4.48 4.40 4.40 4.26 3.84 4.40
July 4.64 4.48 4.48 4.40 4.26 4.00 4.40
Aug. 4.64 4.48 4.40 4.40 4.26 4.00 4.40
Sept. 4.64 4.40 3.80 4.40 4.26 4.00 3.80
Oct. 4.64 4.40 3.80 4.48 4.26 4.00 3.80
Nov. 4.64 4.48 3.90 4.40 4.26 4.00 3.86
Dec. 4.64 4.64 4.64 4.48 4.26 4.00 4.36
* ----indicates no sales in that month.
 
 
 
 [1]
 Hereinafter called Utah Pie
 
 
 [2]
 Hereinafter called Continental
 
 
 [3]
 Hereinafter called Carnation
 
 
 [4]
 Hereinafter called Pet
 
 
 [5]
 Continental, Carnation, and Pet collectively will be referred to hereinafter as the appellants
 
 
 [6]
 Throughout the proceedings Utah Pie shifted from theory to theory as to the basis for its claims of 2(a) violations. In the complaint, the theory was lower prices in Utah than in other western states; at the pretrial, it was lower prices in six western states and higher prices in 'another area'; at the trial, it apparently was lower prices in the Salt Lake City market area (which we will hereafter define) and higher prices in the Los Angeles market area; and the injunctive decree was apparently based on lower prices in five western states and higher prices in the entire State of California. Moreover, in Utah Pie's brief in No. 7308, Utah Pie relies on lower prices in five western states and higher prices in northern California.7 It also reflects the sales volume in 1962 of Continental and Utah Pie and certain pertinent general facts with respect to the parties prior to 1958
 
 
 [8]
 It was stipulated that the only frozen pies here involved were frozen apple, cherry, peach, boysenberry, mince, and pumpkin
 
 
 [9]
 In 1962, Safeway Stores, Inc., with its headquarters in Oakland, California, owned and operated 1,852 food stores in 27 states and the District of Columbia, extending from the East Coast to the West Coast of the United States
 At the trial, Gaylen S. Rigby testified that Safeway maintained a Salt Lake City Division; that such Division embraced all of its stores in Utah, almost all of its stores in Idaho, a few of its stores in eastern Nevada, a few of its stores in Oregon, and a few of its stores in Wyoming; that the aggregate of the stores in the Division exceeded 60; and that Utah Pie delivered the frozen pies it sold to Safeway to the latter's warehouse in Salt Lake City, from which Safeway transported them to its stores located in such Division and elsewhere.
 
 
 [10]
 In 1962, Utah Pie's sales volume in dozens in the Salt Lake City market area was 129,658.3, as compared with 102,690 dozen in 1961
 
 
 [11]
 Associated Grocers is a cooperative organization. It bought for about 400 stores belonging to the organization 'Frost 'N' Flame' brand frozen pies from Utah Pie. It delivered such pies to Associated Grocers, either f.o.b. the latter's warehouse in Salt Lake City or f.o.b. Utah Pie's plant in Salt Lake City. Associated Grocers from such points of delivery transported such pies to such stores, located in Utah, Idaho, and Montana
 
 
 [12]
 Utah Pie first introduced its 'Frost 'N' FLAME' controlled brand frozen pie late in 1959
 
 
 [13]
 In its opinion in Utah Pie Co. v. Continental Banking Co., 386 U.S. 685, at 698, 87 S.Ct. 1326, at 1333, the Supreme Court observed:
 '* * * Continental was a substantial factor in the market in 1957. But its sales of frozen 22-ounce dessert pies, sold under the 'Morton' brand, amounted to only 1.3% Of the market in 1958, 2.9% In 1959, and 1.8% In 1960. * * *'
 
 
 [14]
 Young, the Safeway Frozen Food Department Manager, testified that he had no control over the brands of frozen fruit pies that Safeway Division Managers purchased for their stores; that they were 'autonomous in their purchases'; and did not have to stock 'Bel-air' pies; that he had to 'sell them on Bel-air.'
 
 
 [15]
 Percentage of market for 1962 cannot be determined from record
 
 
 [16]
 Gaylen S. Rigby testified that the only time Utah Pie reduced its prices to meet a price reduction by Continental was its price reduction of $2.75 per dozen for frozen apple pies, made in June 1961; and that all its other price reductions were made because of price reductions by Pet or Carnation. He further testified that up to June 1961 Continental caused Utah Pie no 'competitive difficulty.'
 
 
 [17]
 Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 10 Cir., 269 F.2d 950, cert. den. 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727; American Can Co. v. Russellville Canning Co., 8 Cir., 191 F.2d 38, 54
 
 
 [18]
 On April 1, 1960, Pet changed its fiscal year for accounting purposes from the calendar year to a year ending March 31. Consequently, there is no fiscal 1960 in its accounting
 
 
 [19]
 
 Market Share
 ------------
 1958 Carnation - 10.3% Utah Pie - 66.5%
 1959 Carnation - 8.6% Utah Pie - 34.3%
 1960 Carnation - 12.1% Utah Pie - 45.5%
 1961 Carnation - 8.8% Utah Pie - 45.3%
 Sales Volume
 ------------
1958 Carnation - 5,863 doz. Utah Pie - 37,969.5 doz.
1959 Carnation - 9,625 doz. Utah Pie - 38,372 doz.
1960 Carnation - 22,371.5 doz. Utah Pie - 83,894 doz.
1961 Carnation - 20,067 doz. Utah Pie - 102,690 doz.
1962 Carnation - 5,329.5 doz. * Utah Pie - 129,658.5 doz.
 **
* A lower level than any of the preceding five years.
** The record does not reflect total sales volume for 1962, hence percentage
 market share cannot be computed.